**Clifford JONES, Plaintiff–Appellant,**

v.

**Randall SIMEK, et al., Defendants–Appellees.**

No. 98–2243.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 9, 1998.

Decided Sept. 20, 1999.

Barbara J. Clinite (argued), Chicago, IL, for Plaintiff–Appellant.

Thomas P. Walsh, Office of the United States Attorney, Civil Division, Chicago, IL, Michael S. O'Connell (argued), O'Connell & Ryan, Chicago, IL, for Defendants–Appellees.

Before FLAUM, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Clifford B. Jones suffers from a painful and debilitating condition known as Reflex Sympathetic Dystrophy ("RSD") and, as a result, has lost the use of his right arm and hand. He attributes his affliction to the treatment he received at the hands of the four defendants, all employees of the Federal Bureau of Prisons, during a stay at Chicago's Metropolitan 'Correctional Center ("MCC"). Jones filed this civil rights suit under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleging that the defendants had subjected him to excessive force and refused to give him medical treatment, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. The district court dismissed the medical care claim in response to the defendants' motion in the alternative for dismissal on the pleadings or summary judgment. It allowed the excessive force claim to go to a bench trial, after which the court found for the defendants. Jones now appeals the dismissal of the medical care claim, as well as the district court's decisions on two pre-trial motions. We affirm in part and reverse in part.

## I

Initially, Jones claimed that the defendants caused his RSD, when on three separate occasions MCC officials Randall Simek, Stanley Paciorek, and Michael Rule allegedly used excessive force against him. The defendants denied this, offering in-

stead the theory that his RSD was attributable to either elbow surgery he underwent in the early 1980s or a basketball injury he suffered in May 1993, or a little of both. Because the district court resolved this issue in the defendants' favor and Jones has not appealed on that point, we accept the defendants' view of causation. Nevertheless, both parties agree that Jones does suffer from RSD (or, as the defendants suggest, Complex Regional Pain Syndrome), which remains relevant for his medical treatment claim. We therefore focus our attention on what and when the defendants knew about Jones's medical problems and how they responded to this knowledge.

As it pertains to the medical treatment claim, Jones offered the following account of events. (As we explain below, we are approaching this as a case in which the defendants won summary judgment, rather than a simple dismissal on the pleadings; we thus look to Jones's affidavit and supporting materials for the facts in the light most favorable to him.) On January 14, 1993, Jones complained to an MCC official about pain in his right arm and asked to see a doctor. Defendant Paciorek, who overheard the complaint, informed the official that nothing was wrong with Jones and ordered him placed in isolation. Jones went without medical attention for five days.

During that time, Jones's pain worsened and he began to feel numbness in two of the fingers on his right hand. In late January 1993, he managed to see Defendant Edwin Lopez, a physician at the MCC. Dr. Lopez ordered that Jones be handcuffed only from the front, but otherwise provided no treatment. Jones saw Dr. Lopez multiple times thereafter, but Dr. Lopez refused to prescribe medication in response to Jones's complaints of pain. When Jones insisted that the numbness was increasing, Dr. Lopez promised Jones an appointment with a specialist, but none was provided. Dr. Lopez's demeanor was hostile and insensitive to the point that

when Jones expressed concern about losing his arm, Dr. Lopez said, "So you lose your arm, that won't kill you."

On July 21, 1993, Jones finally saw the longawaited specialist, a neurologist, who diagnosed a nerve blockage in his right elbow. Approximately three weeks later, Jones saw an orthopedic surgeon and then, after another three weeks passed, a neurosurgeon. The neurosurgeon prescribed medication, ordered Jones to wear a sling, and recommended that he see an anesthesiologist. Afterward, Dr. Lopez told Jones he did not have a pass to wear the sling and refused to provide a clean sling. He also denied Jones a medical idle, refused to reinstate the front handcuff only order, denied his request for a medical pass to prevent his right hand from being cuffed, and refused to issue a bottom bunk pass.

On October 22, 1993, Jones once again complained about pain. He initially managed to obtain some medication, which proved to be ineffective, but when prison officials requested permission from Dr. Lopez to issue more medication, the doctor refused. Jones then telephoned his mother, who contacted various authorities to aid in the resolution of the pain medication dispute. Jones did not begin to feel relief, however, until he underwent a nerve block treatment on January 26, 1994.

Based upon the preceding allegations, Jones filed his *pro se* suit in federal court on March 29, 1994. On October 13, 1995, the defendants moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim, or, in the alternative, for summary judgment. Jones obtained the services of his present counsel and filed a response to the defendants' motion. Because the defendants had requested summary judgment, the motion and response were supported by affidavits and other evidentiary materials, including Jones's medical records, and they added a number of factual allegations to those set forth in the complaint.

Jones's summary judgment papers describe the progression of his condition and Dr. Lopez's response in greater detail. Jones maintains that when Dr. Lopez first examined him on January 22, 1993, he was unable to extend his right elbow because of the pain. At that time, Dr. Lopez informed Jones that he was suffering from nerve damage and told him that an appointment with a neurologist would be made. Jones remained in isolation until April 14, 1993. Because inmates in administrative detention cannot sign up for sick call, Jones appealed to the medical staff for relief when they made their rounds. During this period, he reminded Dr. Lopez about the promised appointment with a nerve specialist, but Dr. Lopez treated him with hostility and refused to prescribe pain medication.

After his release from administrative detention, Jones sought treatment at the prison health unit on April 19, April 22, and May 10. Dr. Lopez did not make the promised appointment with a neurologist for Jones until July 21, at which time the specialist diagnosed a nerve blockage. (Jones's medical records reveal that the precise diagnosis was "a conduction block of the ulna nerve at the level of the right elbow.") The visit was apparently unsuccessful because on August 6, still in pain, Jones returned to the health unit and requested a different specialist. The MCC physician who treated him, Dr. Cynthia Alston, recommended a neurosurgery consultation. Jones made further visits to the health unit on August 9, 12, 13, 16, and 19, but nothing was done for him. On August 20, an in-house orthopedist saw Jones, but he was in so much pain that the doctor was unable to complete the examination. After several more visits to the health unit (during which the physician's assistant told Jones she would tell Dr. Lopez about his worsening condition), on August 27 Jones saw a neurosurgeon who prescribed a sling, medication, and a consultation with an anesthesiologist. Back at the MCC, Dr. Lopez essentially disregarded the specialist's advice.

Jones returned to the health unit 17 more times before the end of September. By this time, his right hand was swollen, cracked, and bleeding, and he had lost the use of his right arm from the elbow down. On October 1, Jones again saw the in-house orthopedist, who ordered a ganglion nerve block. However, the block was not performed until January 26, 1994. During the intervening months, Jones continued to suffer, not only from the pain of his condition, but also from the side effects of the pain medication, which made him nauseous.

Not surprisingly, Dr. Lopez offers a significantly different account of the facts. Dr. Lopez acknowledges Jones's numerous visits to the health unit, but he suggests that some of the delays in Jones's treatment occurred because Jones himself failed to show up for scheduled appointments or were otherwise beyond Dr. Lopez's control. For example, although Dr. Lopez requested a neurology consult on June 16, it was not scheduled until July 21. He also points out that the many doctors who examined Jones were unable to agree on a diagnosis. During the August 20 consult, the orthopedist diagnosed "amplification of symptoms or RSD." The neurosurgeon who examined Jones on August 27 reported "melodramatic response of severe pain and discomfort to light touch anywhere in the right arm and hand," and could find no objective symptoms consistent with the pain being reported. On August 29, Dr. Lopez noted that the examinations suggested a non-organic origin and that a psychiatric consult was in order. Before Jones's condition was identified definitively, he made multiple visits to a neurologist, an orthopedist, a neurosurgeon, a psychiatrist, and an anesthesiologist.

Without addressing the competing allegations set forth in the defendants' summary judgment motion and the plaintiff's reply, on February 14, 1996, the district court dismissed the medical care claim for

failure to state a claim on which relief could be granted.

## II

■ The district court's order dismissing the medical treatment claim appears to rely on Rule 12(b)(6) for the dismissal, rather than Rule 56. (The court used the term "dismissal," for example, and it then denied the defendants' motion for summary judgment "in its entirety.") Ordinarily, this would trigger *de novo* review in this court, under which we would accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Hentosh v. Herman M. Finch University of Health Sciences/Chicago Medical School*, 167 F.3d 1170, 1173 (7th Cir.1999). In this case, however, matters are somewhat more complicated. Because there was a trial on the remainder of the case, the defendants have urged us to consider the entire record that was developed at the trial of the excessive force claim, as well as the district court's findings of fact after that trial. That record, they argue, shows conclusively that Dr. Lopez was not deliberately indifferent. Alternatively, because their motion to dismiss was accompanied by an alternative motion for summary judgment, they argue we should look at the summary judgment record.

It would not be appropriate to consider the full record and facts found at the excessive force trial. First, it is indisputable that this goes well beyond the pleadings and was not even before the court on the summary judgment motion. In any event, the court's findings of fact on the excessive force issues are largely irrelevant to the medical treatment claim against Dr. Lopez. At this point our concern is not with the cause of Jones's RSD; the pertinent question is instead when Dr. Lopez learned about these problems and how he responded to this knowledge. The district court made no findings on Jones's treatment at the hands of Dr. Lopez, and a witness might be credible on some points

but not others. The latter fact makes it entirely inappropriate to extrapolate from the district court's decision that Jones was not credible on the excessive force issue into an assumption that his (undelivered) testimony about his medical treatment would also have been unworthy of belief.

The question is thus whether we should approach this case as a dismissal under Rule 12(b)(6) or as a *de facto* summary judgment for the defendants on the Eighth Amendment medical treatment claim. If our review is limited to the pleadings, we think it clear that a remand is necessary. Jones alleged deliberate indifference to a serious medical condition. Under the standards of *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), which recognize a constitutional claim if a deprivation is "sufficiently serious" and the prison official has behaved with deliberate indifference, *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970, this is enough.

■ But we have more than his allegations in the record. In effect, the court converted Dr. Lopez's motion to dismiss into a motion under Rule 56. It accepted evidence outside the record on the part of both the moving parties and the opponent of the motion. Normally, the court still must make it clear that it is converting the Rule 12(b)(6) motion into one for summary judgment, so that the nonmoving party will not be taken by surprise. Moreover, the court has particular responsibilities for *pro se* litigants. *Lewis v. Faulkner*, 689 F.2d 100, 102 (7th Cir.1982). Here, however, all of those things happened even without the formal conversion. The defendants included with their filing the statement describing the consequences of failing properly to respond to a summary judgment motion required by *Lewis*, see 689 F.2d at 102, and Jones responded by obtaining the services of his present counsel. His lawyer then filed an answer to the defendants' motion along with support-

ing materials including Jones's affidavit and his medical records.

In light of the way this record developed, we conclude that we should review the judgment for Dr. Lopez as if it had explicitly been entered under Rule 56. This is *de novo* review, in which the central question is whether the summary judgment record revealed a material factual dispute that would preclude a grant of summary judgment in Dr. Lopez's favor.

■ No one doubts that the deprivation Jones suffered—the medical treatment necessary to preclude severe pain and lost use of his right arm—was sufficiently serious to trigger Eighth Amendment protections. The problem here, as is often the case, is with the defendants' state of mind. *Gamble* holds that in medical treatment cases the state of mind required for liability is one of "deliberate indifference to serious medical needs." 429 U.S. at 106, 97 S.Ct. 285. This encompasses a broader range of conduct than intentional denial of necessary medical treatment, but it stops short of "negligen[ce] in diagnosing or treating a medical condition." *Id.*; see also *Steele v. Choi*, 82 F.3d 175, 178 (7th Cir.1996). *Farmer* reaffirms the *Gamble* standard and stresses that the test for deliberate indifference is a subjective one: the prison official must act or fail to act "despite his knowledge of a substantial risk of serious harm." 511 U.S. at 842, 114 S.Ct. 1970.

■ Counsel for Jones informed us at oral argument that at this point Jones is pursuing his medical treatment claim only against Dr. Lopez and Officer Paciorek. We therefore consider his claim against Simek as abandoned (and it was without merit in any event, because the complaint alleged nothing that would suggest deliberate indifference on Simek's part), and we affirm the district court's judgment to that extent. The district court also dismissed Paciorek for similar reasons: the complaint did not allege that he knew Jones was suffering from a serious medical con-

dition or that he refused to do anything about Jones's medical needs. We agree with this determination. Although in hindsight Paciorek may have been better advised to have Jones checked out after he complained of pain, Paciorek cannot be said to have had subjective "knowledge of a substantial risk of serious harm" based upon the one complaint. We therefore affirm the dismissal of the complaint against Paciorek as well.

■ Jones's allegations regarding Dr. Lopez are more troubling. Jones's affidavit asserts that as of January 22, 1993, Dr. Lopez knew that something might be seriously wrong with Jones. Indeed, according to the affidavit, Dr. Lopez told Jones on that occasion that Jones had suffered nerve damage and that an appointment with a neurologist would be made for him. Nevertheless, again according to the affidavit, with corroboration in the medical records, Lopez's response was to refuse to prescribe pain medication when needed and to fail to provide a promised specialist for six months. Furthermore, on more than one occasion after July 1993, Dr. Lopez refused to follow the advice of the specialists who were treating Jones. If proven, these allegations describe the "deliberate indifference to serious medical needs" that *Estelle* and *Farmer* require. See *Ralston v. McGovern*, 167 F.3d 1160 (7th Cir.1999) (ignoring a physician's therapy decisions can be cruel and unusual). The district court therefore should not have entered judgment in favor of Dr. Lopez.

In their summary judgment filings, the parties tell two very different stories. But at this stage, that does not matter, as long as the evidence Jones presented would, if believed, justify a verdict in his favor. The problem with Dr. Lopez's account is that it is insufficiently attentive to the length of time Jones had to wait before significant efforts on his behalf began. The initial material disputed fact centers on when Dr. Lopez learned that Jones might have serious problems. Jones's affi-

davit and Dr. Lopez's deposition conflict on the question whether Dr. Lopez recognized nerve damage and orally recommended a neurology consult on January 22, 1993. This is the type of factual question that is not appropriately resolved on summary judgment. Viewing the facts favorably to the non-moving party, as we are required to do, we must assume at this point that Dr. Lopez identified Jones's condition as a nerve problem in late January but did not arrange for him to see a nerve specialist until June 16, when he ordered the neurology consult. During the interim, Jones alleges (and Dr. Lopez contests) that Dr. Lopez denied him pain medication and treated him with hostility.

After June 16, Dr. Lopez's actions, with the exception of his refusal to provide Jones the treatment ordered by the specialists, do not amount to "deliberate indifference." Jones saw a series of specialists, albeit not as quickly as he would have liked. Based on their evaluations, Dr. Lopez concluded that Jones might have been suffering from a psychological rather than physical problem. That his diagnosis proved to be inaccurate points to, at most, negligence. Indeed, the specialists who examined Jones evidently had trouble coming to an agreement about his precise problem and its cause. Jones was in pain, and medication was prescribed for him. Even though it proved to be ineffective, this again does not show deliberate indifference. He missed his first appointment for a nerve block, but this unfortunate turn of events was not because of anything Dr. Lopez did. Nonetheless, to the extent that Jones alleges Dr. Lopez denied him medical care between January 22, 1993, when he first examined Jones, and June 16, 1993, and that thereafter he refused to provide specific treatments that were ordered for Jones, Jones has alleged facts sufficient to survive a motion for summary judgment.

## III

■ Jones also challenges the district court's disposition of two motions that his lawyer filed prior to the trial of the excessive force claim. On January 28, 1998, the district court scheduled trial for March 2, 1998. On February 17, plaintiff's counsel filed a motion for a continuance, explaining that she had not been able to get in touch with Jones and that Ken Katsaris, her excessive force expert, was not available to testify on the scheduled trial date. The district court denied the motion because the case was nearly four years old and the parties had received more than one month's notice of the trial. On February 24, plaintiff's counsel sought voluntary dismissal without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2), citing a conflict between the trial date and Jones's medical treatment, as well as the unavailability of his treating physicians. The district court denied this motion as well, although—with the plaintiff's agreement—it granted a one-week continuance. Jones now challenges both rulings and maintains that they prejudiced his trial preparation.

■ We see no problem with either ruling. The district courts have wide discretion to control their dockets by granting or denying motions to continue, *LeBlang Motors, Inc. v. Subaru of America, Inc.*, 148 F.3d 680, 689 (7th Cir.1998), citing *Mraovic v. Elgin, Joliet & Eastern Ry. Co.*, 897 F.2d 268, 270 (7th Cir.1990), and Judge Kocoras did not abuse his here. Indeed, he later granted Jones a continuance, and in the end both Jones and the expert Katsaris were able to testify at trial (and did so). Similarly, there was no abuse of discretion in the court's refusal to dismiss without prejudice. *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 177 (7th Cir.1994). The case was well advanced, the defendants had invested considerable time and resources in trial preparation, as had the court, and Jones's reason for the request (a scheduling conflict) was weak. It is not even clear that Jones preserved this issue for appeal, having agreed to accept a continuance in lieu of voluntary dismissal, but

assuming generously that he did, we see no error.

## IV

For the reasons discussed above, we AFFIRM the district court's judgments in favor of Randall Simek and Stanley Paciorek. We REVERSE and REMAND with regard to Dr. Edwin Lopez. In all other respects we AFFIRM the district court's judgment. Dr. Lopez and Jones shall bear their own costs on appeal; Jones will also be responsible for Simek's costs and Paciorek's costs, to the extent they can be distinguished from those incurred by Dr. Lopez.