# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 02-1823

DIEGO GIL,

*Plaintiff-Appellant,*

v.

JAMES REED, JAIME PENAFLOR,
and UNITED STATES OF AMERICA,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 00 C 724—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED SEPTEMBER 3, 2003—DECIDED AUGUST 25, 2004

_____

Before RIPPLE, ROVNER and DIANE P. WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* Diego Gil, a federal prisoner, sued a prison doctor, a physician's assistant and the United States for negligence, malpractice and deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights. The district court declined his request for the appointment of counsel to assist him in his claims and subsequently granted summary judgment in favor of

the defendants on all claims. We reverse in part and vacate and remand in part.

## I.

On review of this motion for summary judgment, we construe the facts in a light most favorable to Diego Gil, the party opposing judgment, and we draw all reasonable inferences in his favor. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). Gil is a prisoner at the Federal Correctional Institution at Oxford, Wisconsin ("FCI Oxford") who suffers from a number of intestinal and colorectal illnesses. A description of his alleged symptoms, included below, is not for the squeamish. James Reed is a physician who serves as clinical director at FCI Oxford. Jaime Penaflor is a physician's assistant at that same facility. Some of Gil's medical problems predated the events that led to this lawsuit and we address them to give context to the issues.

Before arriving at FCI Oxford in 1994, Gil was incarcerated at the Metropolitan Correctional Center in Chicago ("MCC"). At the MCC, Gil required surgery for a bleeding ulcer. He later experienced rectal bleeding that resulted in a need for blood transfusions. When he was transferred to FCI Oxford, he informed medical staff there of his medical conditions. His medical file described his condition as hemorrhoids, but his symptoms were more severe than would be expected with hemorrhoids. After bowel movements, Gil had to push a large protuberance back into his body. In 1997, an outside specialist examined Gil and determined that he required surgery for hemorrhoids. Shortly thereafter, Gil began to experience additional symptoms, including pain on the right side of his abdomen and a sensation that there was a great pressure pushing outward in that area. Eight months after the specialist determined that Gil needed surgery, he was taken to a local hospital for the recommended operation. The physician who examined him

there told him his condition was much more serious than hemorrhoids. He told Gil that it was his colon, not hemorrhoids, that had been protruding from his body after bowel movements. The physician diagnosed rectal prolapse and told Gil he needed major surgery. Rectal prolapse is an abnormal movement of the rectal mucosa down to or through the anal opening. A rectal prolapse may be partial (involving mucosa only) or may be complete, involving the entire wall of the rectum.[1] Another doctor at that same hospital gave Gil the same diagnosis the next day, confirming that it was his colon that had been protruding from his body and that major surgery was required to correct the condition.

In early March 1998, Gil had abdominal surgery to correct the prolapse and was later returned to his cell at FCI Oxford. After the surgery, Gil's condition worsened and he experienced severe pain in his lower abdomen. On March 20, 1998, Gil told the FCI Oxford medical staff about the pain that radiated from the area of his surgical incision around to his back and legs. A staff member characterized Gil's complaint as "non-urgent back pain" and a "misuse of emergency care." The staff member, who was aware of Gil's recent major surgery, gave Gil a booklet on back exercises and told him to begin performing the exercises. On March 23, Gil returned to the medical unit complaining of pain, fever, chills, and a "bulge the size of a ping-pong ball" at the site of his surgical incision. The staff diagnosed an infection, lanced the bulge, and prescribed Tylenol III and an antibiotic. The physician assistant told Gil he should begin taking the antibiotic that same day and that both medications would be available at the medication line later that day.

---

[1] *See* http://www.nlm.nih.gov/medlineplus/ency/article/ 001132.htm. This is an encyclopedia entry in Medline Plus, an online service of the National Library of Medicine and the National Institutes of Health.

That evening, Gil went to the medication line to pick up his prescriptions. Penaflor was in charge of dispensing medications that evening. When Gil presented his medical pass and asked for both medications, Penaflor picked up two bottles, looked at the labels and gave Gil only the bottle containing Tylenol III. He held onto the other bottle and told Gil in a hostile tone that he could not have the antibiotic. When Gil asked why he could not have his prescribed medication, Penaflor refused to give a reason and ordered Gil back to his unit, threatening that he would be placed in disciplinary segregation if he failed to leave. Gil returned to his housing unit and complained to the duty officer about what had just happened. The duty officer called Penaflor to investigate and Penaflor hung up on him, asserting he was too busy to talk. The duty officer noted the incident in his log and directed Gil to return to the medication line in the morning.

The next morning, Gil returned to the medication line and picked up his prescription. It was labeled with the prior day's date. The antibiotic began to take effect within twenty-four hours and Gil reported that he was feeling better. He returned to the medical unit for three days so that the bulge could be lanced and the abscess drained. Although that crisis passed, Gil's overall condition continued to deteriorate. His rectal prolapse did not improve. After each bowel movement, he still had to painfully push a protruded portion of his rectum back into his body. He developed two hernias that compounded his discomfort.

On May 1, 2000, Gil returned to the hospital for a second surgery to correct the rectal prolapse. The first surgery had been performed through Gil's abdomen, but this second surgery was performed through Gil's rectum by a colorectal specialist, Dr. Michael Kim. After the surgery, Dr. Kim prescribed Vicodin for pain and Colace, Milk of Magnesia and Metamucil (all laxatives) to prevent fecal impaction. Dr. Kim specifically warned Gil that he should not take Tylenol

III because it causes constipation, which would worsen Gil's condition. Gil was returned to FCI Oxford in the evening on the same day as the surgery. That night, the prison medical staff gave him Metamucil, Milk of Magnesia, Colace and Tylenol III. Apparently, Vicodin is not included on the national formulary of drugs used by the Bureau of Prisons, and so the staff substituted Tylenol III. The next day, Gil was seen by Dr. Reed. He told Reed about Dr. Kim's instructions and relayed the warning about Tylenol III. Nonetheless, Reed gave Gil Tylenol III and cancelled Dr. Kim's prescriptions for Metamucil and Milk of Magnesia when he knew Gil was experiencing constipation.

On May 5, 2000, Gil saw Reed again and complained of severe constipation. He had not had a bowel movement since the operation five days earlier, was experiencing severe abdominal pain and was having difficulty urinating. He was also bleeding from his rectum. Reed continued the prescription for Tylenol III and wrote a prescription for Milk of Magnesia which the prison pharmacy did not fill for another three days. On May 8, 2000, Gil received the Milk of Magnesia. The next day he was still constipated, bleeding from the rectum, in great pain and could not urinate. He made an appointment to see Reed but the doctor was unavailable at the scheduled time. Gil waited for an hour in the prison infirmary and then went back to his cell to address the bleeding, change his clothes and lie down.

On May 10, 2000, Gil returned to the infirmary. A different prison physician drained his bladder with a catheter and gave him two enemas for the constipation. This doctor discontinued the Tylenol III and gave Gil Motrin instead. The next day, Gil saw Dr. Kim, who was angry that his postoperative instructions had not been followed. He rewrote his original instructions and prescriptions. He again told Gil not to take any Tylenol III. Back at the prison, Reed told Gil that his prescriptions would be available that afternoon but when Gil went to the medication line, Penaflor provided

him with Tylenol III only. The next day, other medical staff finally provided Gil with Metamucil, Milk of Magnesia and Motrin. On August 7, 2000, Dr. Kim surgically repaired Gil's two hernias.

Gil sued the United States for violations of the Federal Tort Claims Act ("FTCA") and Reed and Penaflor for violation of his Eighth Amendment rights in connection with the medical care he received. He asked the district court to appoint counsel to assist him in bringing his claims. The district court denied the request for appointed counsel, finding that Gil had failed to demonstrate that he had attempted and failed to obtain a lawyer on his own. The court found, however, that even if Gil had made this requisite threshold showing, counsel would not be appointed because Gil had adequate skills to handle the case, the matter was not complex, and *pro se* litigants were afforded wide latitude in complying with rules and procedures. After attempting and failing to hire a lawyer, Gil filed a second motion for appointment of counsel which was also denied. The court adopted the reasoning expressed in its first order and also offered an additional rationale to support the order, which we will discuss below. The defendants then moved for summary judgment and the court granted the motion. For the FTCA claim, the court found, Gil would be required to produce expert testimony demonstrating that the defendants failed to use a reasonable standard of care in treating him. Because Gil failed to name an expert and named as medical witnesses only the defendant doctors who treated him, the court granted judgment in favor of the United States on the FTCA claim. On the Eighth Amendment claims, the court granted judgment in favor of Penaflor because, first, his conduct consisted of, at most, a few isolated instances of neglect when viewed in light of Gil's overall care and because, second, Gil did not have evidence that he was harmed by Penaflor's actions. The court similarly granted judgment in favor of Reed because Reed's actions amounted to a dif-

ference of opinion with another physician and were not adequate to state a claim for deliberate indifference to serious medical needs. Gil appeals.

## II.

We appointed counsel for Gil on appeal after determining that the assistance of counsel and oral argument would materially advance the issues presented on appeal. We asked counsel to brief the following issues in addition to any others that counsel deemed appropriate: (1) whether the district court abused its discretion in denying Gil's request for the assistance of counsel; (2) whether in granting summary judgment the district court erred in requiring Gil to produce expert testimony to proceed on his FTCA claim, either because expert testimony (a) was not required given the particular facts of Gil's medical malpractice claim for inadequate treatment after he was transferred from Chicago to Wisconsin; or (b) is not required for a negligence claim under Wisconsin state law that implicates prison employees' duty to protect inmates in their custody from harm; and (3) whether Gil demonstrated a triable issue of fact as to an Eighth Amendment violation arising from his entire course of treatment at the federal prison in Wisconsin.

On appeal, Gil argues that the district court abused its discretion in denying his request for appointed counsel and made an error of law in applying the standard for appointment of counsel. Gil also contends that the court should not have entered summary judgment on his FTCA claims because he could rely on the defendants' prospective testimony and evidence from his treating physicians to meet the requirement for expert medical evidence. Additionally, Gil argues that he stated a genuine issue of material fact as to his common law negligence claim, a claim for which no medical expert testimony is required. Finally, Gil argues for reversal of the judgment on his Eighth Amendment claims.

## A.

We begin with the question regarding appointment of counsel. In Gil's first request for counsel, the court ruled that Gil had failed to make the required threshold showing that he had attempted to hire counsel on his own and had failed to do so. That alone was enough to deny the motion but the court noted that even if Gil had satisfied the threshold inquiry, the result would be the same. The court noted that Gil requested "appointment of counsel to assist a Spanish speaking plaintiff." The court assumed Gil was suggesting that his use of English as a second language disadvantaged him in his ability to litigate his case. Based on Gil's pleadings in this case and in other cases before the same district court judge, the court found that Gil's language skills did not appear to be limited to a degree that would affect his ability to litigate the case. The court noted that *pro se* litigants were afforded wide latitude in complying with rules and procedures, that the case was not complex, the law was well-settled and the plaintiff was capable of undertaking discovery. The court therefore denied his motion.

Gil filed a second motion for appointment of counsel, this time demonstrating that he had in fact contacted four different law firms in hopes of finding counsel on his own and had been turned down by each one. He explained that he was a Colombian national with limited English skills and that a jailhouse lawyer had been helping him prepare his pleadings. The court denied this second request:

> Because nothing in plaintiff's second motion convinces me that I erred in denying his first motion for appointment of counsel, the second motion will be denied. However, I will offer these additional comments.

September 21, 2001 Order, at 1. The court went on to note that Gil would require a medical expert in support of his claims, and that because the cost of experts is great, most malpractice plaintiffs seek out a lawyer who is willing to

take the case on a contingency basis. The court opined that the contingent fee system served as a reality check for litigants because if no lawyer is willing to take the case, "chances are high that the case is one the lawyers have assessed either as not likely to succeed or not likely to result in a damage award large enough to recoup the expense of prosecuting the case." The court then noted that all of the lawyers Gil approached rejected the case, including a firm that specialized in medical malpractice:

> It is difficult for lawyers to refuse to take a case when the court requests it. In a case such as this one, it would not be appropriate for a court to select a lawyer to take the case without regard for his or her assessment of the risks of incurring the expense of the lawsuit against the probability of succeeding on the merits of the case. Therefore, if plaintiff is to be represented by counsel in this case, he will have to find counsel on his own.

September 21, 2001 Order, at 2.

Gil argues that the district court erred in both the first and second denials of appointment of counsel. He characterizes the court's first order as resting entirely on his failure to demonstrate that he had attempted and failed to retain his own attorney. He claims that the remainder of the court's order is *dicta*. Gil attacks the so-called *dicta* as containing incorrect assumptions about his ability to represent himself and the complexity of the case. He faults the court for failing to consider the difficulty of hiring an expert for an indigent, incarcerated person. He protests that the second order places him in a "Catch-22" by requiring him to demonstrate that no attorney would take his case and then finding that his case was meritless because no attorney would take it.

A fair reading of the district court's first order shows that the court applied the correct legal standard in that order. In the second order, however, we conclude that the district

court abused its discretion. The court's authority to appoint counsel for indigent plaintiffs derives from 28 U.S.C. § 1915(e)(1): "The court may request an attorney to represent any person unable to afford counsel." The next subsection provides, however, that the court shall dismiss the case at any time if it determines that:

>    (A) the allegation of poverty is untrue; or
>
>    (B) the action or appeal—
>
>>        (i)   is frivolous or malicious;
>>
>>        (ii)  fails to state a claim on which relief may be granted; or
>>
>>        (iii) seeks monetary relief against a defendant who is immune from such relief.

28 U.S.C. § 1915(e)(2). In determining whether to appoint counsel for an indigent plaintiff like Gil, a court must "first determine if the indigent has made reasonable efforts to retain counsel and was unsuccessful or that the indigent was effectively precluded from making such efforts." *Jackson v. County of McLean*, 953 F.2d 1070, 1072 (7th Cir. 1992). In its first order, the court noted that Gil's request failed on this initial inquiry because he did not demonstrate that he made any effort to obtain counsel on his own. That finding alone was enough to support the court's first order.

The court nonetheless proceeded to analyze Gil's request as if he had made the threshold showing of an attempt and failure to obtain counsel, turning to the standard we announced in *Farmer v. Haas*, 990 F.2d 319 (7th Cir.), *cert. denied*, 510 U.S. 963 (1993). Gil is therefore correct that the remainder of the first order, at the time it was issued, is properly considered *dicta*. But when Gil filed his second motion, and demonstrated that he had now attempted and failed to obtain counsel, the court adopted the reasoning of the first order, rendering it the controlling ruling on the issue. At this point, it was no longer *dicta*; it was the court's

ruling. After adopting the reasoning of the first order, the court offered "additional comments." Because the second ruling did not rest on the additional comments, they are best characterized as *dicta*. The basis of the final ruling on the issue was the court's application of *Farmer* to Gil's circumstances. We therefore review that analysis.

In *Farmer*, we simplified the inquiry for determining whether to appoint counsel for indigent plaintiffs:

> [G]iven the difficulty of the case, did the plaintiff appear to be competent to try it himself and, if not, would the presence of counsel have made a difference in the outcome?

*Farmer*, 990 F.2d at 322. In answering this question, the court below considered Gil's language skills as demonstrated in his pleadings, the latitude afforded *pro se* plaintiffs on procedural matters, and the complexity of the case. In each instance, the court found that Gil could adequately represent himself. We review that finding for abuse of discretion. *Farmer*, 990 F.2d at 323. "Denying a request for counsel will constitute an abuse of discretion if it 'would result in fundamental unfairness infringing on due process rights.' " *Jackson*, 953 F.3d at 1071-72 (quoting *McNeil v. Lowney*, 831 F.2d 1368, 1371 (7th Cir. 1987), *cert. denied*, 485 U.S. 965 (1988)). *See also Zarnes v. Rhodes*, 64 F.3d 285, 288 (7th Cir. 1995) (we review the court's refusal to appoint counsel for abuse of discretion and reverse only when that refusal amounts to a violation of due process).

At the time the court entered the first order, the ruling it later adopted, it did not have before it an affidavit from Gil's jailhouse lawyer, Robert Ortloff. Ortloff filed the affidavit with the second motion for appointment of counsel. According to Ortloff, Gil indeed had limited language skills and had relied on Ortloff in all of his pleadings. Ortloff stated that Gil is a Colombian national with limited English skills. Additionally, Ortloff was busy litigating an astonishing

fourteen other cases, six on behalf of himself and eight for other inmates. As a result, he felt unable to give Gil's case the attention it needed. The court does not appear to have considered Ortloff's affidavit when it ruled on the second motion. We note that the court had previously appointed counsel for Gil in another case related to his medical care and thus was aware that Gil was not necessarily competent to try such a case.

More importantly, the court appears to have underestimated the complexity of Gil's Eighth Amendment and FTCA claims from both a legal and medical standpoint. As we discuss below, Gil's claims are not as straightforward as they might initially appear, and the legal and factual pitfalls are many for an untrained person unfamiliar with the English language. Using the *Farmer* analysis, we consider the complexity of the case, the plaintiff's competence and whether appointed counsel could have made a difference in the outcome. We will shortly see that the case is rather complex. From Ortloff's affidavit and the court's prior appointment of counsel in a related matter, we note that Gil's competence to try the case was in question. A lawyer would have been able to help Gil untangle the medical and legal questions that we address below and the court would probably not have granted summary judgment had appointed counsel assisted Gil. Under the *Farmer* factors, we must therefore conclude that the court abused its discretion in denying Gil's motion for appointed counsel.

Gil also objects to the district court's "additional comments" in the second order, arguing that the court applied an inappropriate "market test" to his case. As we noted above, in the second order, the court opined that when the suit is one for damages, the contingency system provides a reality check on litigants whose cases may not be as strong as they think. These additional comments were *dicta*; the court had already determined (albeit incorrectly) that under the *Farmer* standard, Gil did not require appointed counsel.

In these additional comments, the court noted that it was reluctant to appoint counsel in a case where a number of lawyers had declined the case after assessing the risks of incurring the expense of the lawsuit against the probability of succeeding on the merits of the case. To the extent that this rationale influenced the court's ruling on the second motion, we agree with Gil that it was not an appropriate consideration. Gil is correct that a plaintiff's suit is not *per se* meritless simply because he was unable to obtain counsel. *Jackson*, 953 F.2d at 1073. The "willingness of counsel to take a case is not a perfect indicator of which claims are important and legitimate nor will counsel always be available." *Jackson*, 953 F.2d at 1073. As we noted, the threshold consideration in determining whether to appoint counsel is whether the inmate has attempted and failed to procure counsel on his own. If that failure can then be used determinatively to demonstrate that the case is meritless, no indigent litigant would ever be appointed counsel. To the extent the court equated the failure to procure counsel with the meritlessness of the case, that equation was error. In sum, we find the court abused its discretion in declining Gil's motion.

## B.

Gil filed lawsuits relating to his medical treatment prior to the first surgery for rectal prolapse in March 1998, including treatment he received at the MCC. The district court had previously disposed of those claims and allowed Gil to proceed here only on claims arising subsequent to the March 1998 rectal prolapse surgery. Gil does not challenge that ruling and so we also confine our discussion to events occurring after the March 1998 surgery. Gil's FTCA claims encompass both medical malpractice and common law

negligence claims.[2] The district court granted summary judgment in favor of the defendants on the FTCA claims because Wisconsin law requires plaintiffs to provide expert evidence regarding the standard of care and Gil named as witnesses only doctors who were defendants or who were contractors for the defendants. On appeal, Gil argues that Wisconsin law does not always require expert testimony, and that the witnesses he named could provide the necessary testimony.

We review the district court's grant of summary judgment *de novo*, construing all facts and drawing all reasonable inferences from those facts in favor of the non-moving party. *Epps v. Creditnet, Inc.*, 320 F.3d 756, 758 (7th Cir. 2003). The FTCA provides in part that the "United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C § 2674. Because a claim brought under the FTCA is governed by "the law of the place where the act or omission occurred," the substantive law of Wisconsin governs Gil's claims for medical malpractice and common law negligence. 28 U.S.C. § 1346(b); *Campbell v. United States*, 904 F.2d 1188, 1191 (7th Cir. 1990). To make out a claim for medical malpractice or negligence in Wisconsin, a plaintiff must prove the following four elements: (1) a breach of (2) a duty

---

[2]  The defendants contend that Gil waived any claim to common law negligence by failing to raise it below. Although his claim for common law negligence may have been inartfully pled in his *pro se* complaint, we will construe his pleadings liberally and give him the benefit of the doubt. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (pleadings of a *pro se* litigant held to less stringent standards than formal pleadings drafted by lawyers). He did claim "reckless and negligent medical care" below and that is sufficient for our purposes. *See Hoskins v. Poelstra*, 320 F.3d 761, 754 (7th Cir. 2003) (a complaint satisfies the requirements of Rule 8 if it notifies the defendant of the principal events).

owed (3) that results in (4) injury or injuries, or damages. *Paul v. Skemp*, 625 N.W.2d 860, 865 (Wis. 2001). "In short, a claim for medical malpractice requires a negligent act or omission that causes an injury." *Id.* To survive summary judgment, Gil need not prove his claim; he need only show that there is a genuine issue of material fact as to each of these elements.

In the medical malpractice setting, Wisconsin requires expert testimony to establish medical negligence except in situations where the errors were of such a nature that a layperson could conclude from common experience that such mistakes do not happen if the physician had exercised proper skill and care. *Christianson v. Downs*, 279 N.W.2d 918, 921 (Wis. 1979) (unless the situation is one where the common knowledge of laymen affords a basis for finding negligence, expert medical testimony is required to establish the degree of care and skill required of a physician); *Fehrman v. Smirl*, 121 N.W.2d 255, 266 (Wis. 1963); *Kasbaum v. Lucia*, 377 N.W.2d 183, 185 (Wis. Ct. App. 1985) (testimony from medical experts is essential to establish a cause of action for medical malpractice except when the doctrine of *res ipsa loquitur* applies). Wisconsin allows application of *res ipsa loquitur* as a substitute for expert testimony in extreme cases where the physician's negligence is obvious such as when a surgeon leaves a sponge or other foreign object inside a patient during surgery or removes the wrong organ or body part. *Richards v. Mendivil*, 548 N.W.2d 85, 89 (Wis. Ct. App. 1996); *Christianson*, 279 N.W.2d at 921. The doctrine of *res ipsa loquitur* is not a rule of pleading but rather a rule of evidence that permits a jury to draw a permissible inference of the physician's negligence without any direct or expert testimony as to the physician's conduct at the time the negligence occurred. *Mendivil*, 548 N.W.2d at 89. Similarly, Wisconsin's preference for expert testimony in proving the standard of care in medical malpractice cases is a rule of evidence, not a substantive rule of law. Although

neither side briefed the issue, we are doubtful that Wisconsin's expertise rule need be applied in federal court where the Federal Rules of Evidence apply exclusively. *See Ueland v. United States*, 291 F.3d 993, 998 (7th Cir. 2002). In federal court, no expert testimony is needed when the symptoms exhibited by the plaintiff are not beyond a layperson's grasp. *Ledford v. Sullivan*, 105 F.3d 354, 360 (7th Cir. 1997) (no expert needed in deliberate indifference case where plaintiff experienced nausea, dizziness, vomiting, a crawling sensation on his skin, emotional and mental regression, and depression when the defendants deprived him of his medication). Nonetheless, a determination of the applicability of Wisconsin's rule is unnecessary to the resolution of the appeal.

Even under Wisconsin's evidentiary expertise rule, Gil's FTCA claims should survive summary judgment. In the claims relating to Reed's actions, Gil proposes to use the testimony of Reed himself as well as the testimony of Dr. Kim, the colorectal specialist who reacted with anger when he learned his post-surgery instructions had been ignored. Nothing in Wisconsin law prevents a plaintiff from relying on the defendant (such as Reed) or the defendant's agents (to the extent that Dr. Kim can be considered an agent of the defendants in this instance) to supply evidence regarding the appropriate standard of care. In fact, in two Wisconsin cases, courts relied on testimony from physicians who were defendants or agents of the defendant to prove issues related to standard of care. In one case where the court had already determined that *res ipsa loquitur* relieved the plaintiff of the need for expert testimony, the court nonetheless opined that the testimony of the surgeon accused of malpractice was "sufficient to place this matter in the field of negligence and malpractice by a physician." *Froh v. Milwaukee Medical Clinic, S.C.*, 270 N.W.2d 83, 87 (Wis. Ct. App. 1978). The physician in that case had inserted a drainage tube in the plaintiff during surgery, and then had removed part of the tube after surgery. When he returned

to remove the remainder, he could not locate the tube but performed no further testing to determine if part of the tube remained. The tube had retracted into the patient's body where it remained for more than two months, causing inflammation and infection. Eventually the doctor located and removed the object. *Froh*, 270 N.W.2d at 84-85. At trial, the doctor, who was determined to be an expert, admitted under adverse questioning that leaving a drainage tube in a patient for more than seven days will cause infection. *Froh*, 270 N.W.2d at 86-87. After citing the Wisconsin requirement for expert testimony on the degree of care and skill required, the court found that the testimony of the doctor who performed the negligent act was sufficient to establish negligence and malpractice. *Froh*, 270 N.W.2d at 87.

In the second case, the court relied on the physician-defendant to establish one of the elements of *res ipsa loquitur*, namely that the event in question would not occur unless there was negligence. *Mendivil*, 548 N.W.2d at 90. In performing a breast biopsy, Dr. Mendivil had placed a localization guide wire in the patient's breast to aid the subsequent surgical removal of the suspicious breast tissue. *Mendivil*, 548 N.W.2d at 87. During surgery, Mendivil inadvertently left a three-centimeter portion of the guide wire in the patient's breast, resulting in sharp pain and the need for a subsequent procedure to remove the wire and resulting scar tissue. *Mendivil*, 548 N.W.2d at 87. The trial court had attempted to distinguish this case from other cases involving foreign objects left during surgery because there was no evidence on how the wire was broken. The Wisconsin Court of Appeals reversed and remanded, finding that the trial court improperly ignored Mendivil's own testimony that it was expected medical practice for surgeons to assure themselves that there are no foreign objects left in a patient when they are finished with surgery. *Mendivil*, 548 N.W.2d at 90.

In the district court, the government proposed no findings

of fact regarding the specifics of Gil's malpractice claim. Rather, the government rested solely on Gil's failure to produce expert testimony that the care provided to him was not within the standard of practice at the time treatment was provided. The district court faulted Gil for failing to name as expert witnesses anyone other than his treating physicians. We hold that Gil may rely on his treating physicians to establish the standard of care, even if those physicians are defendants or agents of defendants. Gil has not cited specific evidence from Reed regarding the standard of care, but relies instead on Dr. Kim's angry reaction upon learning that his instructions had been ignored as demonstrating that Reed's and Penaflor's actions breached the standard of care. At the summary judgment stage, with a *pro se* plaintiff, Dr. Kim's angry reaction and reassertion of his earlier instructions are enough to create a genuine issue on whether Reed and Penaflor were meeting the standard of care required under the law.

In addition, Penaflor's allegedly more deliberate action is similar to leaving a sponge inside a patient and thus no expert testimony is needed. Construing the facts in Gil's favor, Penaflor simply refused to provide a prescribed antibiotic to a person with a serious infection. His angry tone of voice at the time of the refusal could indicate that he had no legitimate reason for the refusal and may have been motivated by malice. It is within a layperson's purview to know that when a serious infection at the site of a surgical wound is diagnosed and an antibiotic is prescribed, failure to supply or delay in supplying the antibiotic can result in unnecessary pain, discomfort and a spreading of the infection. Moreover, if *res ipsa loquitur* does not apply, Dr. Kim could supply the necessary testimony about the standard of care for a person in Penaflor's position. No doubt any physician would testify that delaying antibiotics for a serious infection for no reason other than spite does not meet the standard of care for a physician's assistant. Summary judgment was not warranted because Gil may be able to show just that.

## C.

We turn finally to Gil's Eighth Amendment claim against Reed and Penaflor for deliberate indifference to his serious medical needs. The district court granted summary judgment on this claim because, in Penaflor's case, his action was a relatively brief and isolated instance of neglect, and because Gil could not show he was harmed by Penaflor's temporary withholding of antibiotics. In Reed's case, the court granted judgment because the evidence against Reed at best made out a claim for malpractice in the absence of evidence that Reed knew or should have known that discontinuing laxatives while providing Tylenol III would result in a substantial risk of harm for Gil. Reed's difference of opinion with Dr. Kim, the court found, was not enough to demonstrate deliberate indifference.

We begin with Penaflor. Recall that when Gil showed up at the medication line to pick up his prescribed medication, Penaflor angrily refused to give it to him, threatened him with disciplinary action if Gil would not immediately return to his cell, and later hung up on a guard who called to find out what happened. Gil was able to pick up the antibiotic the next day during a return trip to the medication line. Prison officials violate the Eighth Amendment prohibition against cruel and unusual punishment when their conduct demonstrates deliberate indifference to the serious medical needs of prisoners. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). The defendants do not claim that Gil did not have a serious medical need. Instead, they argue that Penaflor did not have a sufficiently culpable state of mind, that the single incident of refusal of the antibiotic is insufficient when reviewing Gil's medical treatment as a whole, and that Gil was not injured by the delay in receiving the prescribed antibiotic.

Penaflor's angry and unexplained refusal to give Gil his prescribed medication is sufficient to create a genuine issue

of fact regarding his state of mind. Although a negligent or inadvertent failure to provide adequate medical care is insufficient to state a deliberate indifference claim, it is enough to show that a defendant actually knew of a substantial risk of harm to the inmate and acted or failed to act in disregard to that risk. *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002); *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996), *cert. denied*, 520 U.S. 1230 (1997) (in order to be held liable for deliberate indifference, prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference). Penaflor is not a physician but rather is a physician assistant. His job that day was to hand out medications prescribed by the prison doctor. A jury could infer from his angry tone and from his action in hanging up on the guard that his refusal to give Gil his medication was malicious. We have noted that it is difficult to generalize about the civilized minimum of public concern necessary for the health of prisoners except to observe that this civilized minimum is a function both of objective need and cost. *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999). "The lower the cost, the less need has to be shown, but the need must still be shown to be substantial." *Ralston*, 167 F.3d at 1162. Here the cost of handing over the prescribed antibiotic was zero. The drug had been prescribed and dispensed into a bottle labeled for Gil and was in Penaflor's hand when he refused to hand it over. *See Zentmyer v. Kendall County, Illinois*, 220 F.3d 805, 810 (7th Cir. 2000) (Eighth Amendment principles prohibit jail personnel from intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed); *Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001) (failure to respond to inmate's request for prescribed heart medication sufficient to state Eighth Amendment claim when inmate informed prison staff he needed heart medication immediately for fluttering heart and to prevent heavy chest pains). Gil's need for the antibiotic to treat a serious infection involving a surgical wound was

substantial. Gil has shown enough to survive summary judgment on the issue of Penaflor's state of mind. The fact that this was a single incident is not determinative. Although we have stated that isolated instances of neglect in the course of treatment may not be enough to make out a claim for deliberate indifference, *Gutierrez*, 111 F.3d at 1375, this was a deliberate and potentially malicious act. Again, the cost to Penaflor of meeting Gil's serious medical need was zero. In that context, a single incident may be enough to make out a claim for deliberate indifference. Finally, as for Gil's injury, we need not check our common sense at the door. A delay in providing antibiotics will necessarily delay the curing of the infection or possibly lead to its spread. Gil presented testimony as to the pain caused by the infection, which required lancing and draining multiple times, and he also presented evidence that within 24 hours of taking the antibiotic he began to feel better. A jury could infer that Penaflor's delay caused Gil that many more hours of needless suffering for no reason. That is enough to survive summary judgment.

We consider Reed's action next. When Gil returned from the hospital after the second surgery for rectal prolapse, a surgery that was performed through his rectum rather than his abdomen, Dr. Kim sent explicit instructions to take a certain regimen of laxatives (Colace, Milk of Magnesia and Metamucil) and to not take Tylenol III because of its constipating effects. Dr. Kim proscribed Vicodin instead, a drug that is not part of the Bureau of Prison's national formulary. Reed cancelled the Milk of Magnesia and the Metamucil and substituted Tylenol III for the Vicodin. He did this after Gil passed on Dr. Kim's warnings about the dangers of constipation for Gil following rectal surgery. Indeed, our review of the record, which we recount in full above, demonstrates that Reed prescribed Tylenol III no fewer than three times after being warned about the dangers of this drug for persons suffering from rectal prolapse. Eventually, the prison medical staff substituted Motrin for Vicodin.

Motrin is part of the formulary and is not constipating; Reed had this option available at the time he prescribed Tylenol III. This time there is no argument about injury; Gil was severely constipated for more than a week following his rectal prolapse surgery. He suffered much pain and discomfort, rectal bleeding, and an inability to even urinate as a result of Reed's course of treatment. Reed, of course, has a different view of the facts. He prescribed Tylenol III because Vicodin was not available in the prison formulary; he cancelled the Metamucil and Milk of Magnesia because he feared Gil would become dehydrated. He claims that constipation was a risk he could not avoid because Vicodin was not available for him to prescribe.[3]

The defendants and the district court characterize Reed's actions as the result of a difference of medical opinion or at worst medical malpractice. *See Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997) (mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference). Gil maintains that this is not a simple case of differing opinions but that Reed's refusal to follow the orders of the specialist precludes summary judgment. He relies on *Jones v. Simek*, 193 F.3d 485 (7th Cir. 1999), maintaining that the failure to follow the expert's instructions alone creates a genuine issue of material fact on deliberate indifference. In *Jones*, an inmate suffering from arm pain visited the prison doctor a number of times. The inmate alleged that the doctor diagnosed the problem as nerve damage and promised to schedule an

---

[3] We are troubled by Reed's attempt to justify prescribing an admittedly inappropriate drug because the appropriate drug was not a part of the Bureau of Prison's formulary. Because Gil has not raised a claim related to the adequacy of the formulary, we reserve for another day the issue of whether the government or a prison doctor may avoid liability for deliberate indifference by seeking shelter behind an inadequate formulary.

appointment with a specialist. The doctor did not make the appointment for approximately six more months, during which time the doctor refused to provide pain medication and treated the prisoner with hostility (the doctor told a different story but *Jones*, like this case, came to the court on summary judgment and so the court was obliged to credit the inmate's version of events). The specialist prescribed a sling, medication and a consultation with an anesthesiologist. The prison doctor then essentially ignored the specialist's advice for many more months until another specialist performed a nerve block on the inmate. In the meantime, the inmate lost the use of his right arm from the elbow down and suffered great pain. *Jones*, 193 F.3d at 488. We held that the six-month delay in providing an appointment with a specialist and the refusal to then follow the specialist's advice, if proven, met the standard for deliberate indifference to serious medical needs. *Jones*, 193 F.3d at 490. We twice more cited the refusal to provide the treatment ordered by the specialist as facts sufficient to survive a motion for summary judgment. *Jones*, 193 F.3d at 491.

Using *Jones* as our guide, we find that summary judgment should not have been granted in favor of Reed here. Although Reed has an alternate explanation for the course of action he took, Gil has presented sufficient facts to create a genuine issue as to Reed's state of mind in refusing to follow the specialist's advice. For example, Reed claims he could not avoid the constipating effect of pain medication because Vicodin was unavailable to him. His explanation is suspect in light of the fact that prison medical personnel eventually prescribed non-constipating Motrin for Gil, demonstrating that Reed in fact had other options available to him that would have avoided the constipation. And in light of his acknowledgment that Tylenol III is constipating, it is even more curious that he simultaneously cancelled two of the three prescribed laxatives. Again, Tylenol III was a curious choice given the express warning provided by the specialist to avoid this very medication. *See Estate of Cole*,

94 F.3d at 260 (facts showing that a defendant has been exposed to information concerning the risk will permit a jury to infer subjective awareness of a substantial risk of serious harm); *Benjamin*, 293 F.3d at 1037 (fact-finder may conclude that a prison official knew of a substantial risk of harm from the very fact that the risk was obvious). Reed may be able to show at trial that his decisions were simply an exercise of medical judgment rather than deliberate indifference. Deliberate indifference encompasses a broader range of conduct than intentional denial of necessary medical treatment but stops short of negligence in treating a medical condition. *Jones*, 193 F.3d at 490. The test is a subjective one: the prison official must act or fail to act despite his knowledge of a substantial risk of serious harm. *Jones*, 193 F.3d at 490. *See also Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (prison official may be held liable under the Eighth Amendment when he knows of and disregards an excessive risk to inmate safety). On summary judgment, we find that prescribing on three occasions the very medication the specialist warned against because of its constipating effect (when a non-constipating alternative was available) while simultaneously cancelling the two of the three prescribed laxatives gives rise to a genuine issue of material fact about Reed's state of mind. *See Estate of Cole*, 94 F.3d at 259 (a plaintiff may establish subjective awareness of the risk by proof of the risk's obviousness). *See also Snipes v. Detella*, 95 F.3d 586, 592 (7th Cir. 1996), *cert. denied*, 519 U.S. 1126 (1997) (medical treatment may give rise to Eighth Amendment claim when it is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition). Gil has demonstrated a genuine issue of material fact regarding whether Reed was deliberately indifferent to his serious medical needs. For that reason, we vacate and remand for further proceedings consistent with this opinion.

### III.

In sum, we reverse the district court's denial of the motion for appointment of counsel. We vacate the court's judgment in favor of the defendants and remand for proceedings consistent with this opinion.

REVERSED IN PART, VACATED AND REMANDED IN PART.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*