In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-4059

TRACEY WALLACE and ERIC
WALLACE,

*Plaintiffs-Appellees*,

*v.*

JONATHAN S. MCGLOTHAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 05 C 262—**Larry J. McKinney**, *Judge.*

ARGUED SEPTEMBER 23, 2008—DECIDED MAY 26, 2010

Before EASTERBROOK, *Chief Judge,* and KANNE and
TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Dr. Jonathan S. McGlothan at-
tempted to correct Tracey Wallace's vision problems
through eye surgery, but the procedure ended up causing
more harm than good. Tracey and Eric Wallace brought
a diversity suit against Dr. McGlothan for medical mal-
practice under Indiana law. After a trial on causation and
damages, the jury returned a verdict for the Wallaces

and awarded nearly $700,000 in damages. On appeal, Dr. McGlothan challenges the sufficiency of the evidence. We affirm.

## I. Background

### A. The LASIK Surgery and Follow-Up Treatment

Tracey decided to undergo surgery so that she would no longer need to wear glasses or contact lenses, and she hired Dr. McGlothan to perform the procedure. On the patient history form that Tracey completed for Dr. McGlothan, she stated that she had trouble reading fine print and driving at night and in bright sunshine. On April 25, 2002, Dr. McGlothan performed LASIK[1] surgery on Tracey's eyes to improve her vision. LASIK can correct a person's vision by changing the shape of the cornea. During a LASIK procedure, a physician uses a mechanical blade to cut a flap in the patient's cornea (the person's eye is usually anesthetized). The physician then folds the flap back and uses a computer-guided laser to vaporize parts of the stroma, the central part of the cornea. The flap is then laid back down, and after the cornea heals, the patient should have better vision.

Dr. McGlothan started with Tracey's right eye. After he cut the flap, he noticed a "buttonhole flap," a LASIK complication that occurs when the mechanical blade

---

[1] LASIK is short for "Laser-Assisted In Situ Keratomileusis." For more information about LASIK, see HOWARD V. GIMBEL & ELLEN E. ANDERSON PENNO, LASIK COMPLICATIONS 3-9 (1999).

cuts the corneal flap too thin in one or more areas.[2] Dr. McGlothan informed Tracey of the problem, checked his equipment, and replaced the blade. He then proceeded to the left eye. After he made the cut, though, he again noticed that a buttonhole flap complication had developed. He then stopped the surgery, replaced the flaps, put bandage contact lenses in Tracey's eyes, and sent her home.

Tracey returned to Dr. McGlothan's office for follow-up on April 26 and 29. During that time, Tracey stayed at home with the lights dimmed, shades drawn, and, occasionally, sunglasses on. Her eyes were very sensitive to light, and she described that they felt like they had sand thrown in them.

On April 29, after her visit with Dr. McGlothan, Tracey went to see another physician, Dr. Donald Conner, O.D., an optometrist. Before meeting Dr. Conner, Tracey filled out a patient history form stating that she had been "bothered by glare or reflection, particularly when driving at night." Dr. Conner examined Tracey and saw "aberrations" in her corneas that were affecting her vision. He recommended that she see Dr. Francis Price, M.D., an ophthalmologist and cornea specialist, whom Tracey visited the following day. Dr. Price also examined Tracey's corneas and saw the complications caused by the surgery. He determined that her left eye was worse than her

---

[2] For more on buttonhole flap complications in LASIK procedures, see GIMBEL & PENNO, *supra*, at 54-56.

right, and the next day, Dr. Price performed a non-invasive, corrective procedure on Tracey's left eye that involved pulling back the flap created during the surgery, smoothing it out, and laying it back down as evenly as possible.[3]

Tracey continued to see Drs. Conner and Price regularly for some time. Both doctors saw improvement in Tracey's corneas and vision, but they also observed lingering problems. Tracey continually complained of defects in her vision, such as ghosting (a form of double vision), shadowing, and halos and glare around lights. By mid-2003, scarring had developed on Tracey's left cornea, so Dr. Price performed a corrective laser procedure to remove some of the scarring. After the treatment, he again observed improvement. Tracey last saw Dr. Price in June 2006 and Dr. Conner just before trial in 2007. During those visits and up through trial, Tracey still complained of ghosting, shadowing, halos, and glare symptoms.

### B.  The Proceedings and Evidence Presented Below

In 2002, the Wallaces filed a proposed complaint with the Indiana Department of Insurance and appeared before a Medical Review Panel, pursuant to the Indiana Medical Malpractice Act. The Panel concluded that Dr. McGlothan

---

[3]  This procedure is known as Photorefractive Keratectomy or "PRK." For more on the PRK procedure on a patient who has had LASIK, see GIMBEL & PENNO, *supra*, at 121-23.

did not act negligently when operating on Tracey's right eye but was negligent in operating on her left eye. In the Panel's view, Dr. McGlothan should not have proceeded to perform surgery on Tracey's left eye after the buttonhole flap complication arose on the right eye.

The Wallaces then filed a diversity action in federal district court in Indiana on November 1, 2005. Prior to trial, the district court granted partial summary judgment for both sides. Relying on the opinion of the Medical Review Panel, the district court found that Dr. McGlothan was not liable for any damage to Tracey's right eye, but was found to have breached the standard of care as to her left. A jury trial was set to determine the amount of damages, if any, that Dr. McGlothan caused to Tracey's left eye.

At trial, the Wallaces argued that the LASIK complication injured Tracey's left eye and permanently impaired her vision. The jury heard testimony from several doctors, including Drs. Conner and Price, in addition to both Tracey and Eric Wallace. Dr. Conner testified that, on April 29, 2002, he observed "aberrations" and "waviness" in Tracey's corneas due to the surgical flap, and he described his prognosis for Tracey as "poor." Dr. Conner observed that Tracey's vision was "distorted," which is a more general name for the ghosting and glare symptoms, and he explained that such symptoms are congruent with the aberrations he saw in Tracey's cornea. He also explained to the jury why these problems can be particularly severe in dim light, such as at night, and that he had written a letter to Tracey's employer recommending that her hours be adjusted so she did not have to drive after dark.

Dr. Conner observed "irregularities" in Tracey's corneas throughout his treatment of her. When asked whether there had been any change in her condition from her visit in November 2003 to his examination of her just before trial in 2007, Dr. Conner testified: "I think it's become more stable. But the irregularities, the distortion, the aberrations are still present; but they seem to have stabilized." He then said that he saw no change in the extent of the aberrations that he observed in 2007 compared with 2003.

Lastly, Dr. Conner testified to the healing propensities of the cornea and his expectations for Tracey's vision long-term. He testified that, after an injury or surgery on the cornea, a person's vision will gradually heal, but will normally not improve after six months to one year. Dr. Conner stated that he could not foresee any further improvement in Tracey's vision, particularly in dim light or driving situations.

The jury also heard testimony from Dr. Price, via deposition transcript. Dr. Price testified that he first saw Tracey on April 30, 2002, and he described Tracey's cornea as "mangled and kind of cut up into little pieces." Regarding her prognosis, Dr. Price remarked that, "because of the irregularities of the flap and the rest of the cornea, how it all fit together, it's just a very difficult problem to try to remedy and fix." Dr. Price explained that the best time to repair irregularities in a corneal flap is at the time of surgery, because the flap is easier to smooth out. After surgery, folds and wrinkles in the flap are harder to remove. He also testified that he believed the left cornea

sustained more damage than the right. Because the left flap still contained wrinkles five days after the surgery, Dr. Price recommended the "flap lift" procedure. On May 1, he performed this procedure on the left eye and discovered the cornea's condition was worse than he anticipated: "[I]t was one of the worst things I've ever seen."

Like Dr. Conner, Dr. Price testified to his observations and treatment of Tracey over the next several months. Her eye improved but the irregularities did not disappear, and Tracey continually complained to Dr. Price of ghosting and glare. Dr. Price explained that he anticipated both of these symptoms, in addition to problems with night driving, based on Tracey's corneal irregularities and scarring. He attempted to reduce these symptoms through the scar-removal procedure. He noted, however, that the procedure would likely lessen the density of the scarring with time, but "the surface irregularity may not be any better."

Dr. Price also testified about his final examination of Tracey in June 2006. He still observed some areas of scarring and irregularity, and he noted that Tracey still complained of ghosting and glare at night. As to whether what he observed comported with Tracey's symptoms, he said they did in her right eye and did "to some degree" in her left. He stated that Tracey will need ongoing care for the gas-permeable contact lenses, which she must now wear.

The jury then heard from the Wallaces. Tracey testified that the symptoms of ghosting, shadowing, and glare

persist today, and that they are particularly acute at night. Both Tracey and Eric testified that Tracey can no longer drive at night.

On cross-examination, Dr. McGlothan's counsel asked Tracey about the patient history form she filled out in Dr. Conner's office. He asked whether her response on the form pertained to conditions that pre-existed the LASIK surgery, and she testified as follows:

Q: How did you know . . . that you were bothered by glare or reflections, particularly when driving at night, if you had been home with the shades drawn all weekend long and pretty much ever since you had this surgery?

A: I've always had problems with it, and it's just been aggravated since the surgery.

Q: So you're telling us now, today, in October of 2007, that you've always had trouble with glare or reflections, particularly when driving at night?

A: Yes, and the surgery has aggravated it.

Q: So now, in October of 2007, you're telling us for the first time that this is an aggravation of a condition you had before you ever had LASIK surgery?

A: It wasn't as bad.

Finally, the defense put on two witnesses. Dr. Gary A. Fitzgerald, M.D., Tracey's family doctor, testified that he began seeing Tracey for migraine headaches in 1998. He said that Tracey had visited him in July 2001 and told him that she had been in the emergency room for a

corneal abrasion. Dr. Fitzgerald testified that he exa-mined her eyes and did not find any abrasion.

Dr. Maurice John, M.D., an ophthalmologist and the defense's expert witness, testified that he examined Tracey in September 2004. Based on his observations, Dr. John found little wrong with Tracey's left eye. Yet Tracey performed poorly on several vision tests in which Dr. John anticipated that she would perform well. Dr. John said that he had no medical explanation for her performance and believed she was malingering. However, Dr. John also testified that Tracey "may have a little glare" and that he had given her a sample of prescrip-tion eye drops to reduce night glare during the 2004 visit. Lastly, he testified to the cornea's healing propensities, stating first that the cornea "wants to heal." But he also acknowledged that two-and-a-half years had passed since the surgery and remarked, "I doubt that mother nature is going to improve the situation much more."

## C.  Dr. McGlothan's Pre- and Post-Verdict Motions

At the close of the evidence, Dr. McGlothan moved for judgment as a matter of law, arguing that the Wallaces failed to prove that Tracey's left-eye injuries were perma-nent. The approved jury instructions permitted the jury to consider whether the injury was temporary or perma-nent as well as Tracey's average life expectancy in deter-mining damages. The court denied the motion and gave the case to the jury.

The jury returned a verdict of $555,813.57 for Tracey and $122,980.00 for Eric. After the verdict, Dr. McGlothan

renewed his motion for judgment as a matter of law and also moved to amend the verdict and for a new trial. In his renewed motion, Dr. McGlothan again argued that the evidence was insufficient for the jury to conclude the LASIK injury was permanent. Dr. McGlothan also discussed the alleged, undisclosed pre-existing condition, but he did not request judgment in his favor on that basis. The Wallaces did not object to Dr. McGlothan's pre-existing condition argument, and they fully addressed that argument in their response to his renewed motion. The court denied all of Dr. McGlothan's motions and entered judgment for the Wallaces.

Dr. McGlothan timely appealed on two grounds. First, he contends that the district court erred when it denied his motions for judgment as a matter of law.[4] Second, he argues that he was denied a right to cross-examine the Wallaces' experts on the subject of Tracey's pre-existing condition and that the Wallaces committed discovery violations when they failed to disclose that condition.

## II.  Dr. McGlothan's Motions for Judgment as a Matter of Law

We review de novo the district court's denial of a motion for judgment as a matter of law. *Tammi v. Porsche Cars N. Am., Inc.*, 536 F.3d 702, 707 (7th Cir. 2008). "Our inquiry is limited to the question whether the evidence presented, combined with all reasonable inferences permissi-

_____

[4] Dr. McGlothan is not appealing the denial of his motions for remittitur or for a new trial.

bly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Id.* (citation omitted). Because federal jurisdiction in this case rests on diversity, Indiana's substantive law applies. *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 754 (7th Cir. 2004).

This case presents a question of proximate cause as it relates to a jury-determined damages award. Dr. McGlothan does not dispute that he acted negligently in operating on Tracey's left eye[5] but argues that the evidence was insufficient for the jury to conclude that his negligence was the proximate cause of a permanent injury. Under Indiana law, the Wallaces were required to offer expert testimony to show a permanent injury, but according to Dr. McGlothan, the evidence failed to show that Tracey's LASIK injury was permanent; instead, it showed that the injury had healed. Dr. McGlothan further argues that the evidence revealed that Tracey had pre-existing eye problems, so Indiana law required the Wallaces to offer expert evidence proving that Dr. McGlothan "aggravated" this pre-existing condition. Dr. McGlothan contends that the Wallaces failed to carry this burden.

**A.  Preliminary Matters: Forfeiture and Governing Law**

Before we reach the merits of Dr. McGlothan's arguments, two procedural matters loom. First, the Wallaces

---

[5] It had been established on summary judgment that Dr. McGlothan breached the standard of care with respect to Tracey's left eye.

contend that, by failing to raise it in his pre-verdict motion for judgment as a matter of law, Dr. McGlothan forfeited his argument on the Indiana requirement of expert evidence to prove aggravation of a pre-existing condition. Dr. McGlothan admits he made this error but counters that the Wallaces failed to object to his including the pre-existing injury argument in his renewed motion for judgment as a matter of law.

The ordinary rule is that the party seeking a pre-verdict judgment as a matter of law must "articulate the basis necessary on which a judgment as a matter of law might be rendered." Fed. R. Civ. P. 50(a)(2) committee note (1991 amend.). If the court denies the motion, then after the verdict, the party may renew its earlier motion. Fed. R. Civ. P. 50(b). "Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." *Id.* committee note (2006 amend.); *see also Unitherm Food Sys., Inc. v. Swift-Ekrich, Inc.*, 546 U.S. 394, 404-05 (2006) (finding forfeiture of a claim not presented in either the Rule 50(a) or Rule 50(b) motion). Thus, if a party raises a new argument in its Rule 50(b) motion that was not presented in the Rule 50(a) motion, the non-moving party can properly object.

At trial, Dr. McGlothan moved for judgment as a matter of law under Rule 50(a), arguing that the Wallaces failed to prove permanence, but he did not discuss pre-existing conditions. After the verdict, Dr. McGlothan renewed his pre-verdict motion, via Rule 50(b). This time, he still principally argued that he should win on the

permanence issue, but he also mentioned the alleged pre-existing injury and contended that the Wallaces needed to prove aggravation. This argument was too late; the Wallaces could have objected to this new pre-existing condition argument in the Rule 50(b) motion.

But they didn't object. Instead, they responded to Dr. McGlothan's pre-existing condition argument, as well as his permanence argument, on the merits. (Pl. Resp. Def. Post-Trial Mot. 7-8.) A plaintiff's challenge to a defendant's failure to adhere to the procedural prerequisites of Rule 50(a) and (b) is waivable. *Collins v. Illinois*, 830 F.2d 692, 698 (7th Cir. 1987). To properly preserve this challenge for appeal, the plaintiff must have objected when the defendant made his post-verdict motion. Because the Wallaces waited until this appeal to point out Dr. McGlothan's failure to raise the pre-existing injury argument in his Rule 50(a) motion, they have waived their waiver argument.

The second procedural matter is whether, in this diversity suit, the Indiana rules on expert testimony relied on by Dr. McGlothan even apply. Under the doctrine of *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity is bound by state substantive law but applies its own procedural rules. *Musser*, 356 F.3d at 754. The parties in this case apparently have assumed that the Indiana evidentiary rules raised by Dr. McGlothan are substantive, as their briefs do not mention any potential *Erie* problem. We agree with the parties' assumption but think some additional discussion is warranted.

Dr. McGlothan cites Indiana doctrines requiring expert evidence to prove causation in particular types of medical

negligence claims, those involving a permanent injury and/or the aggravation of a pre-existing condition. Since these rules are unique to a discrete area of Indiana tort law and go to the proof required for the causation element of medical negligence, they are properly characterized as substantive. *See Murrey v. United States*, 73 F.3d 1448, 1456 (7th Cir. 1996) (commenting that the Illinois requirement of expert testimony in certain medical malpractice cases is substantive). These Indiana rules are distinct from other evidentiary matters that fall on the procedural side of the *Erie* divide, such as the standards for admitting expert evidence or evaluating the sufficiency of that evidence. *See Maroules v. Jumbo, Inc.*, 452 F.3d 639, 645 (7th Cir. 2006) (clarifying that Indiana substantive law governed the use of expert testimony in a "res ipsa loquitur" negligence case but federal law provided the standard for summary judgment); *Stutzman v. CRST, Inc.*, 997 F.2d 291, 295 (7th Cir. 1993) (holding that the admissibility of expert testimony to prove an Indiana medical negligence case was a procedural matter governed by federal law).

We acknowledge that *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004)—in which we expressed doubt that the Wisconsin requirement of expert testimony for certain medical malpractice claims was substantive—might suggest a different conclusion. In *Gil*, though, we did not have to decide the *Erie* issue because the plaintiff's expert evidence was sufficient under either a state or federal standard. *Id.* at 659-60. Moreover, the Wisconsin rule addressed in *Gil*, which established a broad preference for expert testimony to show negligence by a doctor, *id.* at 659, is distinct from the Indiana rules relevant to this case, in

which negligence is not at issue. Dr. McGlothan does not dispute that he acted negligently in operating on Tracey's left eye but argues that, under Indiana law on the proof required to show causation, the Wallaces failed to prove their claim with the requisite expert evidence.

**B.  Sufficiency of the Evidence on Proximate Cause**

We move to the merits of Dr. McGlothan's sufficiency of the evidence challenge. A negligence case in Indiana consists of three elements: (1) a duty to the plaintiff by the defendant, (2) a breach of that duty by the defendant, and (3) an injury to the plaintiff proximately caused by that breach. *Topp v. Leffers*, 838 N.E.2d 1027, 1032 (Ind. Ct. App. 2005). In this case, the first two elements were established on summary judgment. The trial concerned the third. To prove proximate cause, the plaintiff must show "a reasonable connection between a defendant's conduct and the damages which a plaintiff has suffered." *Id.* (citing *Daub v. Daub*, 629 N.E.2d 873, 877 (Ind. Ct. App. 1994)).

Dr. McGlothan argues that Indiana law requires expert testimony to prove causation in this case. In Indiana, expert testimony is usually required in medical malpractice cases involving issues of permanence and pre-existing injury: " '[T]he question of the causal connection between a permanent condition, an injury, and a pre-existing affliction or condition is a complicated medical question . . . . When the issue of cause is not within the understanding of a lay person, testimony of an expert witness on the issue is necessary.' " *Id.* (quoting *Daub*, 629 N.E.2d at 877) (internal citations omitted).

However, expert testimony is not required in every personal injury case, even when proximate cause is at issue. *Smith v. Beaty*, 639 N.E.2d 1029, 1034 (Ind. Ct. App. 1994). "Causation may be proven by circumstantial evidence if the evidence has sufficient probative force to constitute a basis for a legal inference rather than mere speculation." *Id.* In this sense, expert testimony is not required when "the issue of causation is within the understanding of a lay person." *Id.* Expert testimony that might be insufficient on its own can become sufficient when combined with other evidence. Indeed, expert testimony that "something is 'possible' or 'could have been' may be sufficient to sustain a verdict or award when rendered in conjunction with other, probative evidence establishing the material factual question to be proved." *Roberson v. Hicks*, 694 N.E.2d 1161, 1163 (Ind. Ct. App. 1998) (quotation omitted). Additionally, when the plaintiff's complained-of injury is objective in nature, the plaintiff may testify as to her injury, and "such testimony may be sufficient for the jury to render a verdict without expert medical testimony." *Topp*, 838 N.E.2d at 1032 (quotation omitted). An "objective injury" is one that "can be discovered through a reproducible physical exam or diagnostic studies that are independent of the patient telling you what they feel or where they feel it." *Id.* at 1033 (quotation omitted).

Dr. McGlothan raises a host of arguments related to these Indiana requirements of expert testimony. He contends that the Wallaces failed to offer expert testimony showing that Tracey's left-eye injury was permanent and not merely caused by a pre-existing condition. Dr. McGlothan also points out that, even if expert

evidence showed that the LASIK surgery caused Tracey permanent vision problems, it did not show whether the left eye (the only one damaged by Dr. McGlothan's negligence), the right eye, or both contributed to those problems. Finally, Dr. McGlothan argues that the only expert opinions that might support the Wallaces' claim—the conclusions of Drs. Price and Conner[6]—were too unreliable to be admitted as expert testimony.

Beginning with Dr. McGlothan's challenge to Drs. Price's and Conner's testimony, he argues that their testimony

---

[6] In his Reply Brief, Dr. McGlothan argues that Dr. Conner is not qualified to render opinions about causation or permanence of Tracey's visual symptoms. (Appellant's Reply Br. 2.) He points out that Dr. Conner testified as one of Tracey's treating physicians, not specifically as an expert, and that Dr. Conner said the treatment of such complications was beyond his realm of expertise. However, in his Opening Brief, Dr. McGlothan specifically states that he "is not questioning the qualifications of either Dr. Conner or Dr. Price to testify as to the alleged damages Tracey Wallace experienced." (Appellant's Opening Br. 35.) Dr. McGlothan referred to Dr. Conner as an expert throughout his opening brief, and at oral argument, Dr. McGlothan's counsel conceded that Dr. Conner "had something expertwise to offer."

Dr. McGlothan does not appeal any evidentiary rulings with regard to the admissibility of Dr. Conner's testimony, outside of those discussed below. As such, any objection to the admissibility of Dr. Conner's testimony based on his qualifications is waived. *Duncan v. Wis. Dep't of Health & Family Servs.*, 166 F.3d 930, 934 (7th Cir. 1999) (holding that arguments not developed in the appellate brief will be deemed waived or abandoned).

was unreliable because the doctors did not consider Tracey's alleged pre-existing condition. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Tracey admitted that she was "bothered by glare or reflection" prior to the LASIK surgery, but neither Dr. Price nor Dr. Conner considered that fact when offering their opinions. According to Dr. McGlothan, Drs. Price and Conner were required to consider Tracey's pre-existing condition in order to offer a reliable, expert opinion.

But Dr. McGlothan never objected to either doctor's testimony or moved to strike on these grounds at trial, not even after his cross-examination of Tracey, during which, he contends, he learned of the pre-existing condition. Therefore, this issue was forfeited, and we can only review for plain error. *Estate of Moreland v. Dieter*, 395 F.3d 747, 756 (7th Cir. 2005). "Plain error review of a forfeited evidentiary issue in a civil case is available only under extraordinary circumstances when the party seeking review can demonstrate that: (1) exceptional circumstances exist; (2) substantial rights are affected; and (3) a miscarriage of justice will occur if plain error review is not applied." *Id.* Dr. McGlothan does not address plain error in his brief, but even if he did, he would not prevail. Extraordinary circumstances do not exist, because, as discussed below, the evidence was far from conclusive that Tracey in fact had a pre-existing condition. As such, the district court did not plainly err when it admitted Drs. Price's and Conner's testimony.

Next, Dr. McGlothan argues that, even if admissible, the expert evidence was insufficient to show that

Dr. McGlothan's negligence caused an injury to Tracey's left eye that was permanent, as required by Indiana law. We disagree. The testimony of Drs. Price, Conner, and John was more than sufficient for the jury to find a permanent injury.

Dr. Conner testified that, following the LASIK surgery, he observed "aberrations" and "waviness" in Tracey's left cornea and "distortion" in her vision. He described her prognosis as "poor." Dr. Price, the cornea specialist who saw Tracey five days after the surgery, said he had "never seen a flap that was just so mangled and kind of cut up into multiple pieces" and that "because of the irregularities of the flap and the rest of the cornea, how it all fit together, it's just a very difficult problem to try to remedy and fix." Dr. Price described why Tracey's cornea would be difficult to repair. He stated that the most opportune moment to smooth a corneal flap is at the time of surgery, just after the flap is created. If wrinkles and folds remain in the flap after that time, they can become harder to remove. Dr. Price observed wrinkles in Tracey's left cornea, even though he saw Tracey five days after Dr. McGlothan cut the flap and attempted to replace it. Tracey's condition required Dr. Price to relift the corneal flap, smooth it, and lay it back down.

The evidence showed that over time Tracey's cornea did heal somewhat, which was consistent with Dr. Conner's discussion of the healing process. However, as both Dr. Conner and Dr. John stated, corneal injuries do not continue to heal forever. Dr. Conner estimated the healing stops after six months to one year, and Dr. John

testified that, two-and-a-half years after the surgery, he doubted if there would be any further improvement in Tracey's vision. Dr. Conner also testified repeatedly that he could not foresee any further improvement in Tracey's vision, particularly regarding her problems in "dim light or driving situations." Dr. Price testified that, even after the scar removal procedure he performed to aid the healing process, "the surface irregularity may not be any better."

Indeed, the jury heard that, even after several years, the irregularities and aberrations remained, as did Tracey's symptoms. As of November 2003, Dr. Conner testified that he observed these defects in Tracey's corneas and that Tracey's left eye had not returned to normal. Regarding a 2004 examination, Dr. John admitted that Tracey "may have a little bit of glare" and gave her a sample of prescription eye drops that would help to reduce glare. Finally, as to his exam just before trial in 2007, Dr. Conner testified that "the irregularities, the distortion, the aberrations are still present." When asked whether he observed any change in the extent of the aberrations between 2003 and 2007, he testified, "I think they're just the same." Throughout this time, Tracey's complaints remained constant—ghosting, shadowing, halos, and glare—and these are the symptoms that Drs. Price and Conner testified they expect for a person with irregularities in the cornea.

This expert testimony allowed the jury to conclude that the damage to Tracey's left cornea from the LASIK surgery never fully healed, and would never fully heal. Ac-

cordingly, the evidence was sufficient to show a permanent injury caused by Dr. McGlothan's negligence.

In addition to his permanent injury argument, Dr. McGlothan argues that the Wallaces failed to prove with expert evidence that Tracey's vision problems were not due to a pre-existing injury to her left eye. Dr. McGlothan points to the patient history form that Tracey filled out for Dr. Conner, on which she indicated that she had been "bothered by glare or reflection, particularly when driving at night." Dr. McGlothan's counsel questioned Tracey about whether she had experienced these problems during the short period between the LASIK surgery and her visit with Dr. Conner, or whether the "glare or reflection" problems pre-dated the surgery. She responded, "I've always had problems with it, and it's just been aggravated since the surgery." Dr. McGlothan's counsel twice more confirmed her response. In addition to Tracey's testimony, Dr. Fitzgerald, Tracey's family practice doctor, testified that in July 2001, Tracey visited his office and told him that she had been in the emergency room for corneal abrasions.

Dr. McGlothan argues that this evidence established that Tracey had a pre-existing eye condition that triggered the Wallaces' duty to prove causation by expert testimony. *See Topp*, 838 N.E.2d at 1032. Specifically, he argues that the Wallaces failed to prove through expert testimony the extent to which the LASIK procedure aggravated Tracey's pre-existing condition. *See Alexander v. Scheid*, 726 N.E.2d 272, 284 (Ind. 2000) ("[A] defendant is liable for the aggravation or exacerbation of a current

No. 07-4059

injury, to the extent that the defendant's 'conduct has resulted in an aggravation of the pre-existing condition, [but] not for the condition as it was.'") (quoting *Dunn v. Cadiente*, 516 N.E.2d 52, 56 (Ind. 1987)).

At the outset, we observe that the evidence Dr. McGlothan cites to establish a pre-existing condition is sparse.[7] The jury heard Tracey's testimony regarding Dr. Conner's patient history form and some evidence that she once visited the hospital for a corneal abrasion. Regarding the hospital visit, Dr. Fitzgerald testified that he examined her eye for corneal abrasions in July 2001 and found none. From this, the jury could conclude that any abrasion had healed completely. Other than Dr. Fitzgerald, the jury heard no medical evidence that Tracey had a pre-existing condition.

As for Tracey's testimony about the patient history form, we cannot agree that this testimony required a reasonable jury to conclude that Tracey had a pre-existing eye condition that caused her current vision problems. The expert testimony was sufficient for the jury to conclude otherwise. As discussed, Drs. Conner and Price observed scarring and irregularities to Tracey's left cornea following the LASIK procedure using instruments such as slit-lamp microscope. These objective medical observations

---

[7] Dr. McGlothan argues that he did not have sufficient opportunity to develop this evidence. But as we discuss below, Dr. McGlothan had sufficient notice and opportunity to make this a significant issue at trial. From the record, it appears that he chose not to do so.

gave the jury a sound basis on which to conclude that Tracey's injury was not due to a pre-existing condition. *Cf. Topp*, 838 N.E.2d at 1034-36 (finding insufficient the plaintiff's subjective complaints of back pain where medical experts could only speculate that her pain was caused by the accident at issue).

Tracey's physicians also thought that the type of corneal damage they observed was consistent with Tracey's current vision problems. Dr. Price testified that he anticipated Tracey would have distortion of images, ghosting, and shadowing, along with starbursts, halos, and glare around lights at night. He also testified that he expected "quite a bit of distortion problems with night driving." Dr. Conner testified similarly. Based on what he observed, he expected Tracey to have impaired vision in dim light and driving situations because of oncoming headlights. He wrote a note to Tracey's employer suggesting that Tracey's hours be adjusted to avoid her having to drive at night.

Moreover, Tracey's complaints after the surgery are largely different from the alleged pre-existing condition. Indiana law attaches some significance to the fact that a plaintiff's symptoms after an accident are different from those of which she may have previously complained. In *Roberson v. Hicks*, for example, the court held that a jury could reasonably conclude that the plaintiff's pain was caused by an automobile accident and not by the plaintiff's multiple sclerosis. 694 N.E.2d at 1164. Although the expert lacked medical certainty regarding causation, the court sided with the plaintiff because the plaintiff testified that his pain began shortly after the accident

and that this pain was different from the pain he felt with MS. *Id.* The expert corroborated the plaintiff's account, testifying that the plaintiff's pain was consistent with the kind of pain that one would ordinarily experience after a car crash. *Id.*

Here, there is no evidence that Tracey suffered from ghosting prior to the surgery. Moreover, nothing in the record indicates that ghosting is the same as, or is an exacerbation of, "glare or reflection." Instead, the evidence shows the opposite. When describing each of these symptoms, Dr. Price explained ghosting and glare in different terms. "Glare" concerns light being distorted as it passes through the cornea. Dr. Price described it like a windshield with water droplets on it. With glare, a person could see halos or starbursts when looking at lights. "Ghosting," on the other hand, means that a person sees a double image—Dr. Price described it in terms of a phenomenon that occasionally occurs on old television sets with indoor antennas.

As for Tracey's current complaints concerning glare, the jury could have concluded that this symptom was a result of the surgery as well. Tracey testified that she had been bothered by "glare *or* reflection." But the jury heard from Dr. Conner that reflection and glare are distinct problems. ("I didn't equate them as being equal."). Reflection can be caused by simply wearing hard contact lenses, while glare can come from other sources, such as corneal irregularities or aberrations. Thus, the jury could have inferred that Tracey's testimony regarding her patient history form referred only to reflection, and that her

current complaints of glare are different from any problems she might have experienced before the surgery.

All of this testimony by Tracey and her physicians was sufficient for the jury to conclude that Tracey's current symptoms were caused by Dr. McGlothan's negligently performed LASIK surgery and wholly unrelated to any pre-existing condition.

That brings us to Dr. McGlothan's final challenge to the sufficiency of the evidence. Although we have concluded that the evidence was sufficient to show that Tracey suffered a new, permanent injury to her left eye, Dr. McGlothan points to a lack of evidence comparing that injury to the damage to Tracey' right eye. Recall that the LASIK procedure damaged Tracey's right eye along with her left, but it was established on summary judgment that Dr. McGlothan acted negligently only with respect to the left eye. And although the doctors concluded that the damage to Tracey's left eye was consistent with her symptoms of ghosting, shadowing, halos, and glare, none opined on the extent to which Tracey would have those same symptoms from the damage to her right eye alone. According to Dr. McGlothan, this lack of evidence comparing the left- and right-eye damages demonstrates the Wallaces' failure to prove proximate cause.

We acknowledge that the evidence comparing the injuries to Tracey's left and right eye was sparse. Still, we do not think that this gap in the evidence demonstrates an insufficiency of proof, given the other evidence linking the left-eye injury to Tracey's vision symptoms. As discussed, the doctors testified that Tracey's symptoms

were consistent with their observations of the objective damage to her left eye. So unlike other pre-existing injury cases in which plaintiffs can only speculate on which of several, unrelated factors caused their damages, *see Dunn*, 516 N.E.2d at 54-55 (negligent surgery vs. a pre-existing congenital abnormality); *Topp*, 838 N.E.2d at 1030 (car accident with the defendant vs. a history of other accidents and back pain), in this case the Wallaces showed a causal link between the botched surgery on Tracey's left eye (as opposed to her right eye) and Tracey's symptoms. Moreover, Dr. Price's testimony gave the jury a basis to conclude that the left-eye injury caused harm beyond what Tracey would have suffered from the right-eye injury alone; Dr. Price testified that the damage to Tracey's "mangled" left cornea was worse than that to her right cornea.

To the extent that Dr. McGlothan is arguing that this evidence failed to apportion Tracey's damages between the injuries to her left and right eye, this argument goes more to the amount of the jury's damages award than the issue of proximate cause. *See Ingersoll-Rand Corp. v. Scott*, 557 N.E.2d 679, 682 (Ind. Ct. App. 1990) (characterizing the defense argument on the apportionment of injuries among various causes as a claim of excessive damages). Dr. McGlothan has made clear, both in his briefs and at oral argument, that he is not challenging the verdict amount by appealing his motions for remittitur or a new trial; instead, he appeals only the denial of his motions for judgment as a matter of law based on the proximate cause issues addressed above. Given this appeal's focus on proximate cause rather than the amount

or apportionment of damages, any shortcoming in the evidence comparing the damages to Tracey's left and right eye is no basis for reversal.

In sum, the expert evidence, in conjunction with the Wallaces' testimony, was sufficient for the jury to conclude that the buttonhole flap complication to Tracey's left eye, negligently caused by Dr. McGlothan's LASIK surgery, resulted in a permanent injury that was unrelated to any pre-existing condition. The district court did not err in denying Dr. McGlothan's motions for judgment as a matter of law.

### III.  Right to Cross-Examination and Alleged Discovery Violations and Perjury

Dr. McGlothan also seeks to throw out the Wallaces' suit on account of what he views as discovery violations, perjury, and violations of his right to a fair trial. As discussed, Dr. McGlothan believes that Dr. Conner's intake form and Tracey's responses on cross-examination firmly establish that Tracey had a pre-existing eye condition. Her failure to disclose that condition in her interrogatories or at her deposition, Dr. McGlothan contends, violated the discovery rules, *see* Fed. R. Civ. P. 26(a)(1)(A)(iii), (e)(1), (g); 37(c), and, along with a denial of any prior symptoms at trial, constituted perjury. For these reasons alone, Dr. McGlothan requests reversal. In addition, Dr. McGlothan argues that the Wallaces' failure to disclose the alleged pre-existing condition prevented him from effectively cross-examining Drs. Conner and Price at trial. This, too, in Dr. McGlothan's view, requires that we order the Wallaces' case dismissed.

We are unconvinced. To begin, Dr. McGlothan failed to preserve one of his arguments for appeal: in the district court, he never sought sanctions for the Wallaces' alleged discovery violations. Though Dr. McGlothan alleged that the Wallaces failed to disclose Tracey's pre-existing condition, he did so in the context of his causation argument, contending that the Wallaces failed to prove aggravation. Neither of his Rule 50 motions mentions violations of Rule 26 or seeks sanctions under Rule 37. Issues and arguments not raised before the district court are deemed forfeited on appeal, and we review them only for plain error, which "is rarely applied in civil cases." *Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 430 (7th Cir. 2008).[8]

---

[8] The standard of review for Dr. McGlothan's inability-to-cross-examine argument is less clear. Dr. McGlothan argued in a Fed. R. Civ. P. 60(b) motion for a new trial that Tracey's "revelation" at trial about the pre-existing condition prevented him from cross-examining Drs. Conner and Price. On appeal, though, Dr. McGlothan does not argue that the district court abused its discretion in denying his Rule 60(b) motion, but instead couches this argument within a constitutional right-to-trial framework, which was not discussed in the motion. *See Domka v. Portage County, Wis.*, 523 F.3d 776, 783-84 (7th Cir. 2008) (a specific argument, developed for the first time on appeal, is forfeited even though the "general issue" was raised before the district court). Whether his brief statement about cross-examination was enough to preserve his constitutional argument need not detain us, however, since we conclude below that the district court committed no reversible error.

But even if Dr. McGlothan had preserved his discovery argument, he wouldn't fare any better. Perjury is different from confusion, mistake, or faulty memory; perjury is defined (at least in the federal criminal context) as "'false testimony concerning a material matter with the willful intent to provide false testimony.'" *Montaño v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). And to dismiss a case for discovery violations, the court must first find "willfulness, bad faith or fault." *Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003). We see little or no evidence of that here. This is not a case where the witness concocted some elaborate alibi defense, only to later admit it was all a farce. *See United States v. Griffin*, 310 F.3d 1017, 1023-24 (7th Cir. 2002). And Tracey never admitted that her prior testimony in discovery or at trial was false. *See Allen v. Chi. Transit Auth.*, 317 F.3d 696, 702 (7th Cir. 2003). At most, Tracey's testimony was inconsistent, which might have diminished her credibility before the jury but was in no way perjurous. *See Montaño*, 535 F.3d at 564-67 (describing numerous testimonial discrepancies that constituted "standard-fare impeachment evidence," not proof of perjury).

Comparing Tracey's answers to questions in her deposition, interrogatories, and early at trial with her answers to questions about Dr. Conner's intake form is a bit like comparing apples and oranges. Or at least, the record is unclear which answers are apples and which are oranges. When Tracey was cross-examined about the intake form, she said she had experienced glare or reflection when driving at night prior to the surgery. But that doesn't

establish that Tracey had a pre-existing corneal condition. Tracey's vision wasn't perfect before she had LASIK; she wouldn't have sought the procedure if it was. Tracey wore glasses and contacts, which, the jury heard, often cause glare or reflection when driving at night. Tracey's responses on the intake form and on cross-examination are consistent with a person who wore corrective lenses.

Tracey's testimony in her deposition and at trial that she experienced halos, glare, and difficulty driving at night only after the LASIK procedure is not necessarily inconsistent with her later explanation of the intake form. After the surgery, Tracey complained of a number of symptoms—ghosting, halos, glare, and reflection. All of these would affect a person's ability to drive at night. And indeed, Tracey testified that her night-driving ability is all but non-existent after the surgery, given the severity of her symptoms. But, as the doctors explained, these symptoms weren't caused by glasses or contacts but rather by irregularities in Tracey's cornea, which we have no evidence to suggest were present before the surgery. So when Tracey was asked at her deposition or earlier in the trial about her symptoms, she may have thought the question referred to the kinds of symptoms she now experiences with her damaged corneas, not the everyday glare or reflection caused by glasses or contacts. Notably, in addition to glare and night driving, these questions also referred to "halos," a symptom she has only complained of post-LASIK.

True, Tracey said the surgery "aggravated" her prior problems. But it was well-established that someone

with damaged corneas would find it harder to drive at night. Tracey wasn't necessarily referring to the aggravation of a pre-existing medical condition. She said her night driving was worse after the surgery. That does not definitively establish that Tracey had pre-existing damage to her corneas. It might only mean that prior to surgery she saw reflections in her contacts but after surgery now sees halos and other distortion caused by her irregular corneas. In any event, any inconsistency between Tracey's statements "is the sort of discrepancy that juries routinely sort out." *Montaño*, 535 F.3d at 565. Dr. McGlothan cites no evidence that would support a finding that Tracey intended to perpetrate a deliberate falsehood, so we cannot say that Tracey committed perjury on the witness stand or in her deposition. *Id.*

As for the interrogatories, we see hardly any inconsistency, let alone deception, at all. Both sets of interrogatories asked the same question: "Have you ever suffered other illness, injury, or damage to [your eyes]?" Tracey responded "no." Any glare or reflection Tracey experienced while driving at night cannot be characterized as an "illness, injury, or damage." There was some evidence that Tracey had suffered a "corneal abrasion" prior to the LASIK surgery. However, Dr. Fitzgerald testified that he examined her eyes for such abrasion and found none. Perhaps she hadn't suffered an abrasion after all. Without more evidence, we are hard-pressed to conclude that Tracey answered those questions untruthfully. We see no evidence of a deliberate falsehood, bad faith, or fault, but rather only unclear testimony of the kind that juries routinely sort out.

Beyond the lack of evidence of willfulness, bad faith, or fault, we are also dubious of Dr. McGlothan's claim that he was genuinely surprised by Tracey's cross-examination testimony and suffered some prejudice that would justify a sanction like dismissal. For some time prior to trial, Dr. McGlothan had two patient history forms in his possession. Tracey filled out one of these forms at Dr. Conner's office a few days after the LASIK surgery. On this form, Tracey marked that she was bothered by glare or reflection, particularly when driving at night, and it was this form that Dr. McGlothan's counsel referenced during his cross-examination of Tracey. Dr. McGlothan argues, however, that Dr. Conner's form did not give him notice that Tracey's night-driving problems pre-dated the surgery, because the form could have referred to Tracey's condition during the short period between the surgery and Tracey's visit to Dr. Conner. It was only at trial, Dr. McGlothan goes on, that he learned that Tracey never left her house during that period, which led him to conclude that Tracey's response on Dr. Conner's form referred to a problem Tracey experienced prior to surgery.

But Dr. McGlothan had another form in his possession prior to trial—one that Tracey filled out at Dr. McGlothan's office *before* the LASIK surgery ever took place. On Dr. McGlothan's form, Tracey also marked that she had trouble driving at night. Although the form does not specifically mention glare or reflection, this form made Dr. McGlothan aware that Tracey had complained, prior to the surgery, that she had problems with night driving. Dr. McGlothan could have explored both intake forms earlier in discovery and cross-examined

Drs. Conner and Price on them at trial. Or if Dr. McGlothan thought that these forms showed a pre-existing condition that "independently cause[d]" Tracey's loss, *Dunn*, 516 N.E.2d at 56, he might have requested an appropriate jury instruction that he could not be liable unless his conduct "resulted in an aggravation of the pre-existing condition," Ind. Civil Pattern Jury Instruction 11.26, cmt. But instead of probing the available evidence before and during trial to get to the bottom of Tracey's pre-LASIK vision problems, Dr. McGlothan decided to use the pre-existing condition issue as an attack on Tracey's credibility. He tried to play "gotcha" by waiting until Tracey's cross-examination to whip out Dr. Conner's form, which he viewed as contradicting her testimony. That's a strategic choice Dr. McGlothan made. Moreover, Dr. McGlothan was fully able to recall Dr. Conner or Dr. Price, move to strike their testimony, or move for a continuance after Tracey testified on cross. He chose not to. Instead he proceeded with his evidence and argument on lack of permanent injury and, in closing argument, emphasized Tracey's purportedly inconsistent testimony on her pre-existing condition to impugn her credibility. These choices convince us that Dr. McGlothan suffered no deprivation of the opportunity to cross-examine Drs. Conner and Price on the forms he had in his possession years before trial. We refuse to entertain Dr. McGlothan's backdoor attempt on appeal to now make the pre-existing condition argument he wished he had made at trial.

## IV. Conclusion

The evidence was sufficient to show that Dr. McGlothan's negligence was the proximate cause of the Wallaces' injuries, and Dr. McGlothan has not shown any perjury or discovery violations by the Wallaces that would warrant reversal. We AFFIRM the district court's denial of Dr. McGlothan's motions for judgment as a matter of law and AFFIRM the judgment.