#30643-aff in pt & rev pt-MES
**2025 S.D. 43**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

GOLDENVIEW READY-MIX, L.L.C.,
a South Dakota Limited Liability Company,       Plaintiff and Appellee,

    v.

GRANGAARD CONSTRUCTION, INC.,
A South Dakota Corporation,       Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
MCCOOK COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHRIS GILES
Judge

* * * *

TIMOTHY R. RAHN
DANIEL R. FRITZ of
Ballard Spahr, LLP
Sioux Falls, South Dakota       Attorneys for defendant and
appellant.


MIKE C. FINK
Bridgewater, South Dakota       Attorney for plaintiff and
appellee.

* * * *

ARGUED
FEBRUARY 19, 2025
OPINION FILED **07/23/25**

#30643

SALTER, Justice

[¶1.] Golden View Ready-Mix, LLC (Golden View) commenced this action to collect the balance due for concrete supplied to Grangaard Construction, Inc. (Grangaard). The complaint alleged breach of contract for failing to pay, breach of the implied obligation of good faith and fair dealing, and fraud. A jury returned a verdict in favor of Golden View on the breach of contract failure to pay claim and awarded damages. The jury also found Grangaard had breached its duty of good faith, but it found no liability under the fraud claim. However, because the verdict form allowed it, the jury awarded punitive damages on the contractual breach of good faith claim. Grangaard appeals both the imposition of punitive damages and the circuit court's decision to submit the fraud issue to the jury. Golden View contends Grangaard did not preserve the specific issue relating to the jury's consideration of punitive damages. We reverse in part, vacating the punitive damages award, but we otherwise affirm the circuit court's judgment.

**Factual and Procedural Background**

*Supplying concrete for the bridge project*

[¶2.] Grangaard is a Watertown-based general contractor that specializes in concrete construction and regularly completes projects for the South Dakota Department of Transportation (DOT). Over the past twenty years, Grangaard has completed roughly one hundred DOT projects, including numerous bridge projects.

[¶3.] In 2021, the DOT let a bridge project for the demolition and construction of a bridge on Highway 38 outside of Salem. This particular project was considered an "emergency" because the existing bridge allowed only one-lane

-1-

traffic. For such projects, the DOT incentivizes early completion. The DOT contract for the Salem bridge contained an early completion lump-sum bonus of $200,000 and a daily bonus of $1,400 per day up to $42,000.

[¶4.]    In preparing its bid, Grangaard contacted Golden View, which operates a ready-mix concrete plant in rural McCook County, a few miles from the bridge. Grangaard informed Golden View that the project called for A45 concrete. Though the parties did not discuss the amount that would be needed, Golden View provided an estimate of $130 per cubic yard which Grangaard then used in computing its bid.

[¶5.]    Grangaard submitted the lowest responsible bid and was awarded the project in April 2021. Shortly thereafter, Grangaard called Golden View to confirm the $130 per yard quote. Golden View agreed and outlined its payment terms, including expectations for monthly payments and a credit limit of $10,000. The parties, however, never memorialized their agreement in writing.

[¶6.]    By contrast, the separate written contract between Grangaard and the DOT spanned several hundred pages and incorporated the DOT's Standard Specifications for Roads and Bridges (Standard Specifications). Relevant here, the Standard Specifications set out strength and quality standards required by the DOT for the concrete, as well as the inspection and sampling procedures, the penalties for failing to meet the DOT's standards, and the process for challenging the results of DOT tests. Notably, none of these terms were conveyed by Grangaard to Golden View.

[¶7.]    Golden View began supplying concrete for the project in June 2021. The DOT collected samples from each delivery, and, as set out in the Standard

Specifications, acceptance ultimately depended upon the concrete's 28-day compressive strength. For the A45 concrete supplied by Golden View, the DOT required a minimum 28-day compressive strength of 4,500 pounds per square inch (PSI).

[¶8.] In September 2021, the DOT notified Grangaard that concrete poured for the bridge footing in August failed four successive strength tests, including one as low as 3,530 PSI. To avoid removing and replacing the concrete, Grangaard elected to "core" the concrete represented by the cylinders, or drill into the concrete to extract another cylindrical sample to conduct additional strength testing. The coring yielded samples averaging 3,890 PSI, which the DOT engineer determined to be structurally adequate and accepted, subject to a corresponding deduction.[1]

[¶9.] Around this same time, Golden View grew concerned over Grangaard's payment history. On multiple occasions, Grangaard's outstanding balance exceeded Golden View's $10,000 credit limit. Upon completion of the bridge footings and piers in October 2021, Grangaard had an outstanding balance of $16,154.58.

[¶10.] On October 21, the DOT conducted its pre-pour inspection where the DOT engineers and officials concluded that the work completed to that point was satisfactory and authorized pouring of the bridge deck the following day. Away from the inspection, Grangaard owner and vice president Jeremiah Grangaard met separately with Golden View principals, Sam and Brian Waldner. During the meeting, the Waldners inquired about payment and Jeremiah's satisfaction with

---

1.      The DOT notified Grangaard on January 11, 2022, months after completion of the bridge project, that it assessed a deduction of $23,000 for the nonconforming concrete represented by the core sample.

Golden View's concrete.  As to the latter inquiry, Jeremiah provided a positive response that Sam Waldner recalled as "all good," or words to that effect.

[¶11.]       Regarding payment, the Waldners asked Jeremiah to settle the outstanding balance, or Golden View would refuse to supply the concrete for the bridge deck.  The Waldners also sought new payment terms for the bridge deck— half due the day after the pour and the remaining half thirty-days later.  Jeremiah agreed and paid off the outstanding balance but claims the agreement was conditioned upon there being no deductions.

[¶12.]       The following day, Grangaard workers completed pouring the bridge deck.  By the end of the day, it was clear that deductions would be assessed for nonconforming concrete.  Initial calculations resulted in an estimated $27,000 deduction.  The on-site DOT engineer relayed that amount to Grangaard, though both knew that the DOT's area engineer was responsible for determining the finalized deductions.[2]  Grangaard did not pay Golden View half of the amount for the concrete the day after the deck pour, as the parties had discussed at their October meeting.

[¶13.]       Golden View submitted its final invoice to Grangaard totaling $89,343.32 on November 9, 2021.  Having not received payment over a month later, Golden View emailed Grangaard on December 14 and inquired as to when it could expect payment.  Grangaard responded: "We are waiting on the test results from the DOT before we send out any payment."

---

2.    The DOT's area engineer greatly reduced these deductions and notified Grangaard on January 11, 2022, of deductions totaling $10,140 for nonconforming concrete on the bridge deck.

[¶14.] Grangaard received its final deductions from the DOT on January 24, 2022. In total, the DOT assessed $35,678.92 in deductions for concrete supplied by Golden View. By that time, Golden View had retained counsel. When Grangaard attempted to contact Golden View to discuss a setoff against its outstanding balance, Grangaard was directed to speak with Golden View's attorney. The parties ceased communications, and Golden View never received payment for the concrete used on the bridge deck.

[¶15.] On February 7, 2022, the DOT notified Grangaard it had met the conditions under the incentive provision for early completion. As a result, Grangaard received a lump sum bonus of $200,000 and additional daily bonus amounts of $23,800 for a total bonus payment from the DOT of $223,800.

***The lawsuit***

[¶16.] On August 3, 2022, Golden View commenced this action against Grangaard seeking to recover the outstanding balance of $89,343.32 plus interest under a breach of contract theory. In addition, Golden View sought punitive damages on separate claims—one for "fraud/deceit" and another styled as "bad faith" under SDCL 57A-1-304, though more completely described as a breach of the implied contractual obligation of good faith and fair dealing.[3] These claims largely stem from the October 21 conversation between Jeremiah Grangaard and Brian and

---

3. The text of SDCL 57A-1-304 provides: "Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement." Title 57A is South Dakota's codification of the Uniform Commercial Code (UCC). The UCC applies to the sale of goods. *See* SDCL 57A-2-102. Neither party disputes that the concrete supplied by Golden View constituted goods under the UCC.

Sam Waldner. Specifically, Golden View alleged Grangaard's promise to pay and the statement of "all good" were both untrue and made to induce Golden View to deliver concrete for the bridge deck.

[¶17.] Grangaard answered, denying liability and asserting a counterclaim for breach of contract based primarily upon the deductions it incurred as a result of what it alleged was Golden View's substandard concrete. Grangaard requested a jury trial, and the circuit court scheduled a week-long jury trial for January 2024.

[¶18.] Following extensive discovery, Grangaard moved for partial summary judgment on Golden View's fraud claim. Relevant here, Grangaard asserted there was no separate legal duty outside of the contract to support the fraud claim and invoked what is commonly known as the independent tort doctrine for the proposition that Golden View's remedies, if any, were limited to contract law. *See Schipporeit v. Khan*, 2009 S.D. 96, ¶ 7, 775 N.W.2d 503, 505 ("Tort liability requires a breach of a legal duty independent of contract.").

[¶19.] Alternatively, Grangaard contended that, even if there was a basis for an independent tort claim for fraud, Golden View factually could not support each element. Grangaard maintained that Golden View agreed to provide concrete for the entire project. As a result, Grangaard could not induce Golden View to act pursuant to an existing oral contract in the midst of performance.

[¶20.] In its opposition, Golden View asserted that, although not yet assessed, Grangaard knew it was facing deductions from the DOT, so in promising to pay, "Grangaard suppressed facts ([i.e.,] that it intended to withhold payment), and instead gave other facts which were likely to mislead . . . ([i.e.,] that the early

concrete was 'all good')[.]" To Golden View, Grangaard "committed fraud by making statements/assurances which induced Golden View" into supplying concrete for the bridge deck.

[¶21.] At an October 2023 hearing, the circuit court noted its concerns about "convert[ing] a contract case into a tort for fraud" but ultimately denied Grangaard's motion for summary judgment on the fraud claim. Taking the facts in the light most favorable to Golden View, the court concluded it "potentially [could] see a picture being painted by [Golden View] that might be credible with the jury that [Grangaard] did fraudulently induce them to continue with the second half."

[¶22.] In the month leading up to trial, Golden View filed a motion to conduct discovery on punitive damages and to submit the issue of punitive damages to the jury. Grangaard opposed the motion, citing SDCL 21-3-2, which limits a jury's consideration of punitive damages to "the breach of an obligation not arising from contract[.]" Grangaard maintained that punitive damages were improper because the fraud claim "rest[ed] upon alleged facts and obligations which . . . 'ar[o]se from the contract' between the parties for [the] delivery of concrete." Notably, Grangaard's response only discussed the punitive damages claim in connection with the fraud claim.

[¶23.] Grangaard also filed a motion in limine seeking "to exclude evidence of the amounts [it] received from the State . . . for the bridge project or any profit that [Grangaard] may have derived [from the contract]." Grangaard asserted that this evidence was not relevant. In response, Golden View contended the evidence was

relevant to the "bad faith or fraud" because it revealed Grangaard's priority "to keep the project rolling so that it could receive an early completion bonus."

[¶24.] Following a January 3, 2024 hearing, the circuit court denied Grangaard's motion in limine to exclude evidence of amounts received from the DOT. Regarding Golden View's motion to permit discovery on punitive damages, the court held its decision in abeyance.

### *The special verdict form and the state of the record*

[¶25.] Both parties submitted proposed special verdict forms with their proposed jury instructions. Important to this appeal, Golden View's proposed verdict form appeared to conspicuously blend the legal concepts of the contractual duty of good faith and fair dealing with the distinct tort claim of fraud by allowing the jury to consider punitive damages under either theory:

> 4.      Did Grangaard breach it's [sic] duty of Good Faith?
> Yes: ___ ;  No: ___ ?
>
> 5.      Did Grangaard commit fraud:  Yes: ___ ;  No: ___ ?
>
> If you[r] answer to questions 4 and 5 is both <u>no</u>, then you shall
> not proceed to further answer these Special Interrogatories. *If
> your answer to either question 4 or 5 (or both) is <u>yes</u>, then you
> may answer the following question:*
>
> 6.      We further assess against the Defendant the sum
> of $ _____ for punitive damages (if any)[.]

(Emphasis added.) For its part, Grangaard restricted its own proposed special verdict form to its counterclaims, making no mention of fraud, bad faith, or punitive damages.

[¶26.] Although Grangaard objected to Golden View's special verdict form, it did so generally by stating, "Grangaard also objects to Golden View's proposed

special interrogatory and verdict form." However, Grangaard did not propose any changes to Golden View's proposed special verdict form or object to the potential that the jury could consider punitive damages based solely on the breach of the duty of good faith and fair dealing.

[¶27.] At trial, Golden View referenced, at various points, Grangaard's profits from the DOT contract. In its opening statement, Golden View explained that Grangaard had charged "the [DOT] over a million dollars for the concrete that was used at that site. Almost half of that million dollars was profit."

[¶28.] After Golden View concluded its case in chief, the circuit court revisited Golden View's motions regarding punitive damages that it had previously held in abeyance. The court also considered Grangaard's motion for judgment as a matter of law under SDCL 15-6-50(a) (Rule 50(a)) on all counts.

[¶29.] The circuit court denied Grangaard's Rule 50(a) motion, but, as it related to the breach of the duty of good faith claim and the fraud claim, the record reveals apparent imprecision concerning these two markedly different claims. The parties and the court frequently referred to the breach of the contractual duty of good faith and fair dealing claim as a "bad faith" claim which was often fused with the fraud tort claim.

[¶30.] Regarding Golden View's motion to undertake discovery on punitive damages, Grangaard, again, focused solely on the fraud claim, returning to its independent-tort-doctrine argument that the fraud claim should not be submitted to the jury. However, Grangaard did not argue that punitive damages were not authorized for a breach of the implied contractual duty of good faith, and in its

comments to the circuit court highlighting the contract/tort distinction, Grangaard limited its discussion of SDCL 21-3-2 to the failure to pay theory of breach of contract:

> Punitive damages are only allowed in South Dakota when a party [b]reaches, quote, "an obligation not arising from contract." That's 21-3-2. What's the obligation that they claim was breached as the basis of the fraud claim? Failure to pay. What's the obligation that arises from a breach-of-contract claim? Failure to pay. It's the same obligation.

[¶31.] The circuit court responded: "If we were only pursuing the breach-of-contract count, I would agree with you. But we're not. *The bad-faith count is alive, as well as fraud and deceit. The obligation arising from something other than the contract terms is the obligation of good faith and fair dealing.*" (Emphasis added.) Critically, Grangaard made no argument, clarification, or correction in response to this statement that incorrectly regarded the contractual duty of good faith as an intentional tort, like fraud. The court granted Golden View's motion to undertake discovery on punitive damages and to submit punitive damages to the jury.

[¶32.] The following day at trial, Golden View briefly called Jeremiah Grangaard as an adverse witness to elicit testimony related to possible punitive damages over Grangaard's objections. In a series of leading questions, Jeremiah agreed that the total bid to the DOT was $3,612,979.96; Grangaard's gross receipts in 2021 exceeded $13 million, and its total income that same year was almost $3 million. On cross examination, Jeremiah testified that Grangaard's 2021 net income was $200,811 and that the deductions resulting from the concrete used for the Highway 38 bridge project were between $47,000 and $60,000.

[¶33.]    While settling jury instructions, Grangaard asserted standing objections to the instruction on the implied covenant of good faith and fair dealing, the punitive damages instruction, and the fraud instructions. These standing objections, as far as we can tell, implicated Grangaard's arguments in opposition to submitting fraud and punitive damages to the jury.

[¶34.]    For the special verdict form, the circuit court primarily adopted Golden View's proposed version, *see supra* ¶ 28, and specifically read the critical part of the special verdict form aloud:

> Number 4, did Grangaard breach a duty of good faith? Yes or no. [Number 5,] [d]id Grangaard commit fraud? Yes or no. . . .
>
> If your answer to *either Question 4 or 5* or both is yes, then you must answer Question 6: We further assess against Grangaard the sum of blank of punitive damages, if any.

(Emphasis added.)

[¶35.]    Following the circuit court's reading of its proposed verdict form in its entirety, Grangaard made a standing objection, but in the lengthy discussions that followed, it did not reference an objection to the part of the special verdict form that allowed the jury to consider punitive damages solely for a breach of the duty of good faith. Rather, Grangaard's two "fundamental" objections related to the absence of a question allowing the jury to award a setoff and the absence of a threshold interrogatory incorporating the requisite state of mind from the punitive damages definition before Question 6. As to the latter, the circuit court agreed, resulting in a two-part Question 6 in the final verdict form. Question 6(a) first asked: "Do you find that Golden View suffered injury as a result of oppression, fraud, malice, intentional misconduct, or willful and wanton misconduct?" If yes, Question 6(b)

-11-

instructed the jury to assess the amount of punitive damages, if any, to be awarded against Grangaard.

[¶36.] The jury returned a verdict in favor of Golden View, finding Grangaard breached the contract and was liable for the entire outstanding balance of $89,343.32 plus interest. In addition, the jury answered in the affirmative on Question 4—whether Grangaard breached its duty of good faith—but found Grangaard did not commit fraud. Still, having answered yes to either Question 4 or 5, the jury was prompted to consider the question(s) relating to punitive damages.

[¶37.] The jury concluded that Golden View was injured "as a result of oppression, fraud, malice, intentional misconduct, or willful and wanton misconduct" in response to Question 6(a) and, for Question 6(b), it assessed punitive damages in the amount of $50,000. The jury also found that Golden View did not breach its agreement with Grangaard, rejecting Grangaard's argument that it was allowed to set off damages it owed by the deductions imposed by the DOT for what Grangaard asserted was the nonconforming A45 concrete.

[¶38.] Grangaard filed a post-trial motion under SDCL 15-6-50(b) (Rule 50(b)) renewing its request for judgment as a matter of law or, in the alternative, a new trial. In its supporting brief, Grangaard, for the first time, shifted the focus of its argument to Golden View's breach of the implied obligation of good faith claim. Citing persuasive authority, Grangaard asserted, "[a] claim of breach of the implied covenant of good faith and fair dealing cannot support a punitive damages claim."

The circuit court denied the motion and entered judgment for Golden View in the amount of $174,187.21.[4]

[¶39.] Grangaard appeals, raising two issues. It asserts first that the circuit court erred when it allowed the jury to award punitive damages for a breach of the implied obligation of good faith. Second, Grangaard argues that the trial court erred by allowing the fraud and punitive damages claims to be presented to the jury. Golden View, however, contends Grangaard did not preserve the specific issue relating to the jury's consideration of punitive damages for the breach of the duty of good faith and fair dealing claim.

## Analysis and Decision

### *Preservation of error*

[¶40.] Before considering the merits of Grangaard's claim that the circuit court erroneously allowed the jury to consider and award punitive damages for a breach of the implied duty of good faith, we must first determine if the issue is properly before us. "It is well established that 'we will not review a matter on appeal unless proper objection was made before the circuit court.'" *Osdoba v. Kelley-Osdoba*, 2018 S.D. 43, ¶ 23, 913 N.W.2d 496, 503 (citation omitted). Under SDCL 15-6-51(c)(1), "[a] party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds of the objection." The standard is a practical one, however, and not meant to be a rigid or formulaic test. In this regard, our inquiry is whether a

---

4. This amount represents: (1) the breach of contract award ($89,343.32); (2) interest from and after Nov. 9, 2021 ($34,843.89); and (3) the punitive damages award ($50,000).

party's objection was "sufficiently specific to put the circuit court on notice of the alleged error, so it has the opportunity to correct it." *Osdoba*, 2018 S.D. 43, ¶ 23, 913 N.W.2d at 503 (quoting *Halbersma v. Halbersma*, 2009 S.D. 98, ¶ 29, 775 N.W.2d 210, 220).

[¶41.] The rules that require parties to preserve claims of error relating to jury instructions apply equally to verdict forms. *See Grynberg v. Citation Oil & Gas Corp.*, 1997 S.D. 121, ¶ 32, 573 N.W.2d 493, 503-04. "It is the parties' duty to request jury instructions and special interrogatories for their theory of the case." *Huether v. Mihm Transp. Co.*, 2014 S.D. ¶ 21, 857 N.W.2d 854, 862 (citation omitted). "Although no particular formality is required when objecting to instructions, it must be clear that the trial court was advised of possible errors so it has the opportunity to correct the instructions." *Hogg v. First Nat. Bank of Aberdeen*, 386 N.W.2d 921, 925 (S.D. 1986). "The failure of a court to correctly or fully instruct the jury is not reviewable unless an objection or exception to the instruction identifying the defect therein with sufficient particularity was taken or a written instruction correctly stating the law was requested." *Huether*, 2014 S.D. ¶ 21, 857 N.W.2d at 862 (quoting *Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752, 757 (S.D. 1994)).

[¶42.] Grangaard objected to multiple instructions and submitted nearly fifty of its own proposed instructions. However, none of these identified its principal issue on appeal—the legal error it alleges in connection with awarding punitive damages for the breach of the implied contractual obligation of good faith. Golden View's pretrial proposed verdict form contained the text that allowed the jury to

consider punitive damages if it found either a breach of the duty of good faith or fraud. And, after nearly a month of pretrial submissions, a four-day trial, and detailed discussions among counsel and the court concerning the jury instructions and the special verdict form, the asserted error in the latter remained.

[¶43.] In its appellate brief, Golden View has noted this and argued that the punitive damages issue is, in fact, not preserved. Grangaard disputes the claim and asserts in its reply brief that it "specifically objected to Golden View's special interrogatory and verdict form." But the objection it references was not specific; it was a general objection to the entirety of Golden View's special verdict form and simply stated, "Grangaard also objects to Golden View's proposed special interrogatory and verdict form." *See Alvine Fam. Ltd. P'ship v. Hagemann*, 2010 S.D. 28, ¶ 20, 780 N.W.2d 507, 513–14 (concluding a general objection was not sufficient to preserve the issue for appellate review); *Duda v. Phatty McGees, Inc.*, 2008 S.D. 115, ¶ 27, 758 N.W.2d 754, 762 ("An attorney must be clear when objecting to jury instructions 'so the trial court is advised of what possible errors exist and be granted an opportunity to correct any instructions.'" (citation omitted)). Nevertheless, Grangaard maintains that this "specific" objection served as a reference to one of its many standing objections.

[¶44.] We are not convinced. Read in context, the general objection to Golden View's proposed special verdict form only related to Grangaard's repeated argument that the fraud claim should not be submitted to the jury because there was no tort duty independent of the parties' oral contract. But even if the court acted erroneously by overruling this objection and submitting the fraud claim, that is not

the error that led to the jury's $50,000 punitive damage award because the jury concluded that Grangaard had *not* committed fraud. *See Hewitt v. Felderman*, 2013 S.D. 91, ¶ 12, 841 N.W.2d 258, 262 (concluding any asserted error related to the circuit court's denial of the plaintiff's motion for summary judgment on the issue of negligence was moot because the jury ultimately found that the defendant was negligent).

[¶45.] Further, the contractual duty identified by Grangaard's independent tort doctrine objection was limited to its obligation to pay Golden View—not the duty of good faith. In fact, as to the good faith claim, it does not appear that the parties and the court carefully distinguished between the implied contractual duty of good faith and the tort of fraud. At many points in the record, the parties and the court simply refer to the breach of the duty of good faith claim simply as a "bad faith" claim, often as an adjunct to the fraud claim, as if both were intentional tort claims that could support an award of punitive damages—an inaccurate view, as we explain below.

[¶46.] Under these circumstances, it is perhaps easy to understand how the contractual duty of good faith became confused with the tort of bad faith and then conflated with fraud. A fair reading of the record reveals that Golden View's factual theory that Grangaard lied to Sam Waldner about paying for the concrete and withheld information about the DOT deductions was applied indiscriminately to both the fraud claim and the "bad faith" claim.

[¶47.] At oral argument, Grangaard acknowledged that it did not identify the specific issue on the verdict form allowing for the jury to award punitive damages

solely for a breach of the implied contractual duty of good faith. Although this failure "[t]ypically, . . . would be fatal to consideration of the issue on appeal[,]" *Mealy v. Prins*, 2019 S.D. 57, ¶ 39, 934 N.W.2d 891, 902, Grangaard maintains its post-trial Rule 50(b) motion placed the issue "squarely before" the circuit court. Under the particular facts before us, we agree.

### Rule 50(b)

[¶48.] Rule 50(b) provides in relevant part: "If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, . . . [t]he movant may renew its request for judgment as a matter of law by filing a motion no later than ten days after notice of entry of judgment." As its name suggests, a *renewed* motion for judgment as a matter of law "is based on and relates back to [the prior Rule 50(a) motion] made at the close of evidence." *In re Est. of Tank*, 2023 S.D. 59, ¶ 29, 998 N.W.2d 109, 120 (alteration in original) (quoting *United States v. State*, 1999 S.D. 94, ¶ 7, 598 N.W.2d 208, 211). As a general rule, then, "a post-trial motion for judgment 'may not advance additional grounds that were not raised in the pre-verdict motion.'" *Id.* ¶ 30 (quoting *Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*, 381 F.3d 811, 821 (8th Cir. 2004)).

[¶49.] But "our rules regarding waiver and failure to preserve issues for appeal . . . appl[y] with equal force to Rule 50(a) and 50(b)." *Id.* ¶ 31. And, somewhat ironically, a nonmovant's "challenge to a [movant's] failure to adhere to the procedural prerequisites of Rule 50(a) and (b) is waivable." *Id.* (quoting *Wallace v. McGlothan*, 606 F.3d 410, 419 (7th Cir. 2010)). In *Tank*, we held: "If a party believes opposing counsel's Rule 50(b) motion exceeds the grounds stated in

counsel's Rule 50(a) motion, the issue should be brought first to the circuit court's attention, so they may determine whether the grounds asserted were proper." *Id.* ¶ 31, 998 N.W.2d at 120–21 (citation omitted). However, the "fail[ure] to raise the inadequacy" in response to a Rule 50(b) motion "preclude[s] [the nonmovant] from raising the issue on appeal." *Id.* at 121 (quoting *Howard v. Walgreen Co.*, 605 F.3d 1239, 1243-44 (11th Cir. 2010)).

[¶50.]     Here, Grangaard's post-trial Rule 50(b) motion included grounds not previously advanced in its Rule 50(a) motion. Grangaard's stated grounds in its post-trial motion related exclusively to the claimed error associated with awarding punitive damages for the breach of the implied contractual obligation of good faith.

[¶51.]     The circuit court did not immediately deny Grangaard's Rule 50(b) motion. Grangaard submitted the motion on January 24, and the court entered its order denying the motion on January 30. In the time between, Golden View made no objection, and in the absence of an objection to the scope of the Rule 50(b) motion, the legal error Grangaard identified was properly in front of the court. And, faced with authority to the contrary, the court had a clear opportunity to correct the claim of error that is now the subject of this appeal. *See Tank*, 2023 S.D. 59, ¶ 31, 998 N.W.2d at 120 ("The trial court must be given an opportunity to correct any claimed error before we will review it on appeal. . . . Failing to raise an issue, thereby [not] allowing the circuit court an opportunity to correct the claimed error, results in waiver of the issue." (alteration in original) (quoting *In re M.D.D.*, 2009 S.D. 94, ¶ 11, 774, N.W.2d 793, 796–97)).

[¶52.] Accordingly, the merits of Grangaard's punitive damage argument are properly before us in this appeal.

**Punitive damages and the implied obligation of good faith**

[¶53.] As noted above, SDCL 21-3-2 permits the imposition of punitive damages "[i]n any action for the breach of an obligation not arising from contract[.]" In other words, "[p]unitive damages are recoverable only when a 'party can prove an independent tort that is separate and distinct from the breach of contract.'" *Schipporeit*, 2009 S.D. 96, ¶ 7, 775 N.W.2d at 505 (quoting *Grynberg*, 1997 S.D. 121, ¶ 18, 573 N.W.2d at 500). "Because torts arise out of a legal duty, . . . our focus must be 'on whether a legal duty exists independent of the obligations under the contract.'" *Wright v. Temple*, 2021 S.D. 15, ¶ 57, 956 N.W.2d 436, 454–55 (internal citations omitted) (quoting *Grynberg*, 1997 S.D. 121, ¶ 22, 573 N.W.2d at 501).[5]

[¶54.] Here, the legal obligation giving rise to the jury's punitive damages award—the implied obligation of good faith—unquestionably arises from a contract. As set out in Count 2 of its complaint, however, Golden View paradoxically alleged "bad faith" under SDCL 57A-1-304 and requested punitive damages as a result of "Grangaard breach[ing] its obligation to act in good faith[.]"

[¶55.] We have recognized the *tort* of bad faith and the corresponding availability of punitive damages, but its application is limited to insurance contracts. *See, e.g., Zochert v. Protective Life Ins. Co.*, 2018 S.D. 84, ¶ 38, 921 N.W.2d 479, 490. We have not equated a breach of the duty of good faith with the

---

5. "The existence of a legal duty is a question of law. We review questions of law de novo." *Grynberg*, 1997 S.D. 121, ¶ 22, 573 at 501 (citations omitted).

tort of bad faith in any other context, and, in fact, "[w]e previously indicated that 'South Dakota does not recognize an independent [tort] for breach of the implied covenant of good faith and fair dealing.'" *Schipporeit v. Khan*, 2009 S.D. 96, ¶ 7, 775 N.W.2d 503, 505 (second alteration in original) (quoting *Farm Credit Servs. of Am. v. Dougan*, 2005 S.D. 94, ¶ 6, 704 N.W.2d 24, 27). In the context of the UCC, the provisions of SDCL 57A-1-304 do not even represent a separate claim; "[r]ather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract[.]" SDCL 57A-1-304 cmt. 1.[6]

[¶56.] Under the circumstances, the jury's decision to award $50,000 in punitive damages contravenes the plain language of SDCL 21-3-2, which allows punitive damages "[i]n any action for the breach of an obligation *not arising from contract*[.]" (Emphasis added.) Golden View, for its part, did not offer substantive arguments to the contrary in its appellate brief or at oral argument.

[¶57.] Having confirmed the existence and reviewability of the legal error associated with the jury's punitive damage award, we must determine the proper relief.

---

6.  "Although the comments to the [UCC] were not adopted by the South Dakota Legislature, this Court has found them to be a helpful guide to interpreting the text of the Code." *Stern Oil Co. v. Brown*, 2012 S.D. 56, ¶ 18 n.7, 817 N.W.2d 395, 402 n.7.

*New trial*

[¶58.] Grangaard argues that the submission of the fraud claim and the attendant financial evidence relating to punitive damages resulted in prejudice beyond the punitive damages award itself. In Grangaard's view, the entire verdict must be vacated in favor of a new trial.[7]

[¶59.] "If the jury's verdict can be explained with reference to the evidence, rather than by juror passion, prejudice or mistake of law, the verdict should be affirmed." *Wright*, 2021 S.D. 15, ¶ 34, 956 N.W.2d at 447–48 (quoting *Morrison v. Mineral Palace Ltd. P'ship*, 1999 S.D. 145, ¶ 14, 603 N.W.2d 193, 197). "An error is deemed prejudicial when there exists 'a reasonable probability that, but for the error, the result of the proceeding would have been different.'" *Braun v. Wollman*, 2024 S.D. 83, ¶ 26, 16 N.W.3d 237, 244 (quoting *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686).

[¶60.] Also, "a new trial on all the issues" is warranted where "multiple issues are so interwoven that they cannot be submitted to the jury independently of one another without confusion and uncertainty[.]" *Reinfeld v. Hutcheson*, 2010 S.D. 42, ¶ 21, 783 N.W.2d 284, 290 (citation omitted); *see Maybee v. Jacobs Motor Co.*, 519 N.W.2d 341, 345 (S.D. 1994) (holding circuit "court's refusal to grant new trial on all issues was an abuse of discretion" where issues of liability and damages were too interwoven to be separable).

---

7. The question presented to the circuit court of whether Golden View's fraud claim was supported by a duty independent of the parties' contract has been rendered nonjusticiable by the jury's determination that Grangaard did not commit fraud.

[¶61.] Here, the financial evidence relating to punitive damages established that Grangaard's total bid for the project was over $3.6 million; and that, in 2021, its gross receipts exceeded $13 million, total income amounted to nearly $3 million, and net income was $200,811. Grangaard asserts that submitting these figures to the jury tainted the entire verdict, as evidenced by the jury awarding Golden View the full contract amount for compensatory damages and rejecting Golden View's counterclaim for setoff damages. We cannot accept this argument.

[¶62.] Even if the total bid price and Grangaard's 2021 income information should not have been admitted, we think there is insufficient justification for a new trial.[8] This particular financial information did not play prominently into Golden View's case and, in fact, not even in its request for punitive damages. Golden View advanced a claim for punitive damages briefly at the end of its closing argument and not again in its rebuttal close. And, notably, the argument for a punitive damage award was not based upon Grangaard's overall financial condition.

[¶63.] Instead, the punitive damages argument was much different; Golden View claimed Grangaard refrained from conducting its own quality testing and providing the results to Golden View because the testing was time consuming and jeopardized Grangaard's ultimately successful effort to obtain its early completion

---

8. Of course, to definitively conclude whether the punitive damages evidence was properly admitted, we would need to review the moot claim concerning the circuit court's conclusion that Golden View's fraud claim reflected a duty independent of its contract with Grangaard. However, we believe it is unnecessary to do so and simply assume, without deciding, that the punitive damages evidence should not have been admitted in order to analyze Grangaard's request for a new trial.

bonus. But because the testing would have allowed Golden View the opportunity to address quality concerns, Golden View argued in closing that Grangaard should be punished by foregoing "a quarter of [the $220,000 early completion bonus]." And critically, the evidence of the early completion bonus was admitted without objection during the on-site DOT engineer's testimony and was unconnected to the disputed evidence relating to punitive damages.[9]

[¶64.]     Beyond this, the nature of Grangaard's counterclaim for damages necessarily meant that some of the evidence concerning its profit for the bridge project was properly admitted. Grangaard's effort to recover offsets imposed by the DOT was expressed in terms of the price the DOT paid Grangaard for the concrete, not the price that Golden View charged Grangaard. The evidence at trial established that Grangaard's concrete price under the DOT contract was $975 per yard for the lower portion of the bridge and $1,200 per yard for the bridge deck. It was against these amounts that Grangaard sought to recover DOT-imposed offsets against Golden View. However, the evidence indicated that Golden View's price to Grangaard was $130 per yard. Consequently, the jury had evidence of the substantial difference Grangaard was charging the DOT relative to the price it was paying Golden View. After he was impeached with his deposition testimony at trial, Jeremiah Grangaard acknowledged that his company's profit for the deck portion of the project alone was approximately $500,000.

---

9.     Though not explicitly mentioned, Grangaard's motion in limine seeking to exclude evidence of amounts it received from the DOT for the bridge project seemingly would include the early completion bonus. The circuit court, however, denied Grangaard's motion, and Grangaard has not separately challenged that determination on appeal.

[¶65.] And finally, the jury was correctly instructed on the UCC rules for acceptance, breach, and damages. Specifically, the jury received instructions on a party's ability under the UCC to set off damages for the receipt of nonconforming goods. From these instructions, the jury found no liability for Golden View, and based upon our review, the jury's verdict awarding no setoff damages to Grangaard finds ample support in the record.

[¶66.] Under the circumstances as they uniquely appear here, we see insufficient support for the idea that the punitive damages error contributed to the jury rejecting Grangaard's counterclaim or that the two issues were so interwoven that a new trial is necessary. Our conclusion is strengthened by the fact that the jury found no liability under Golden View's fraud theory, suggesting that the jury's passion was not so inflamed that it disregarded the circuit court's instructions. *See State v. Belt*, 2024 S.D. 82, ¶ 34 n.4, 15 N.W.3d 732, 740 n.4 (noting that the jury's decision to acquit a criminal defendant of more serious charges "provides tangible, if implicit, support for the view that the jury correctly understood its role" and was not impacted by an asserted error).

## Conclusion

[¶67.] Having concluded the implied obligation of good faith issue is preserved and properly before us, we reverse in part, vacating the punitive damages award. However, we decline to order a new trial on remand and affirm the circuit court's judgment in other respects because we conclude there is insufficient evidence that "but for the error, the result of the proceeding would have been different." *Braun*, 2024 S.D. 83, ¶ 26, 16 N.W.3d at 244 (citation omitted).

-24-

#30643

[¶68.] JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN,

Justices, concur.